BISSELL CHILLED PLOW WORKS v. T. M. BISSELL PLOW CO. et al.

(Circuit Court, W. D. Michigan, S. D. October 2, 1902.)

1. UNFAIR COMPETITION—CORPORATE NAME—RIGHT TO USE NAME OF PERSON—
Complainant corporation was organized in 1881 under the name of "The South Bend Pulp Company," and engaged in business at South Bend, Ind., in the manufacture of wood pulp, and also in the manufacture and sale of plows. Its largest stockholder, who was president and general manager, was T. M. Bissell, who had been in the manufacture of plows for some years, and was the holder of patents for improved methods of making the same, which he transferred to the corporation. Its plow business was separate, and was always conducted under the department name of "The Bissell Chilled Plow Works," and all of its plows were marked with the name "Bissell," in connection with other designations, and became known to the trade by such name. The making of plows was or became its principal business, and in 1891, with the consent of Bissell, its name was changed, through statutory proceedings in the court, to "The Bissell Chilled Plow Works," and it continued its business from that time under such name. About that time, Bissell, having sold a part of his stock, retired from the management, and he

---

¶ 1. Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.

thereafter organized a corporation under the name of "The T. M. Bissell Plow Company," which engaged in the manufacture and sale of plows in South Bend, making substantially the same plows as complainant, and marking them with the name "Bissell." After a year or so Bissell died, and the business of such corporation was discontinued. Subsequently certain of defendants residing at Eaton Rapids, Mich., purchased a part of the stock, patterns, etc., of the corporation, taking an assignment of the right to use its corporate name, and organized the defendant corporation under the same name which engaged in making plows at Eaton Rapids. Circulars were issued, stating the removal of the company from South Bend, and containing pictures of Bissell, and referring to him as "the inventor of chilled plows, once made in South Bend, Indiana, now only by The T. M. Bissell Plow Co., Eaton Rapids, Mich." Its plows were also all marked with the name "T. M. Bissell," and were similar in design and appearance to those of complainant. The original Bissell patent for chilling was owned, and the process used, by complainant, which also held shop rights for the use of later patents, some of which were afterward owned and used by defendant. No one by the name of Bissell, or connected with the prior Indiana corporation of the same name, had any connection with defendant. There was evidence that retail· purchasers in many cases did not know the difference between the two makes, and would accept either as a Bissell plow. *Held,* that the second Indiana corporation had no right to use the name "Bissell" as it did, either in its corporate name or as a mark on its product, as against complainant, which had acquired the prior right, and that defendant obtained no right by the attempted assignment; that the action of defendant in the use made of the name in both respects constituted unfair competition.

**2. Same—Corporations in Different Localities.**

The fact that two corporations are located in different communities does not affect the right of one to an injunction restraining the other from unfair competition by adopting a similar corporate name, where they are engaged in the same business, and their products are both sold in the same open markets.

**8. Same—Right to Relief—Fraudulent Intent.**

The right to relief against unfair competition is not dependent upon an actual fraudulent intent, where the conduct of defendant was such as would naturally deceive the public as to the origin of its goods, and where it is shown that such deception actually resulted.

**4. Same—Effect of Laches.**

Simple laches in the institution of a suit for unfair competition, as by a delay of six years, with knowledge of defendant's acts, will not defeat the right of a complainant to an injunction, where the right is clear, although it may preclude the recovery of damages for the past wrong.

In Equity.    Suit for unfair competition in trade.

This is a suit by the Bissell Chilled Plow Works, an Indiana corporation, engaged in the business of selling plows and wood pulp of its own manufacture at South Bend, Ind., against the T. M. Bissell Plow Company, a Michigan corporation, engaged in the business of selling plows of its own manufacture at Eaton Rapids, Mich., and certain officers thereof. The relief sought is an injunction restraining defendants from using the proper name "Bissell" as part of the name of the defendant corporation, or upon the plows sold by it, and a recovery of damages for past use thereof in such connection. The question to be determined is whether the. facts shown by the evidence in the record are such as to entitle complainant to all or either part of this relief.

---

¶ 2. Corporate or firm name as trade-name, see notes to R. W. Rogers Co. v. Wm. Rogers Mfg. Co., 17 C. C. A. 579; Kathreiner's Malzkaffee Fabriken Mit Beschraenkter Haftung v. Pastor Kneipp Medicine Co., 27 C. C. A. 357.

Complainant was incorporated and organized January 11, 1881. Its name at first, and until June 2, 1891, was "The South Bend Pulp Company." On that date it wàs changed to "The Bissell Chilled Plow Works," its present name, by the judgment of the circuit court of St. Joseph county, Ind., of which South Bend is the county seat, in proceedings had in pursuance of the statutes of Indiana, begun February 21, 1891. Its business has always been as before stated, but the principal part thereof for from some time before the change in name, if not always, has been the sale of plows, and, if it still continues to sell wood pulp, it is only to a small extent. These two departments of its business have always been kept separate and distinct. Before the change in corporate name, it had a trade-name for its plow department, to wit, "The Bissell Chilled Plow Works," the same which so became its corporate name. This was the trade-name of that department before that change, from the very beginning. There was nothing done by it in connection therewith that was not done in that name. All correspondence, bill heads, letter heads, price lists, advertisements, and contracts in relation thereto were in that name. Its plow business could not have been done more completely in that name had such been its corporate name, and was not done less completely than all its business has been done therein since the change. The plows sold by it have always been marked in this manner: Stenciled upon one of the handles of all plows, except an old-style cast plow, àre the words "Bissell's Improved," and upon the beam of most all having wooden beams the words "The Bissell Chilled Plow, South Bend, Ind.," and upon the beam of some the words "Bissell Chilled Plow Works," "Bissell Cast," or "The Bissell Patent Chilled Plow." The different styles are designated by numbers or letters. These plows have always been advertised, known in the plow trade, and called for by intending purchasers, by the name of "Bissell Plows," and these words thus used mean and have always meant plows made and sold by complainant.

The way in which complainant came to use the proper name "Bissell" in said connection was this: The moving spirit in its incorporation and organization was one T. M. Bissell. He was its principal stockholder, and, upon its organization, became its president and general manager. He had theretofore, for a period of over 20 years, been engaged in the business of making plows for sale with and for others at South Bend, had invented a process for chilling the moldboards of plows, known as a "hot water chill," whereby a substitute for steel, having its hardness and polish, yet cheaper, was provided, for which he had obtained a patent May 18, 1880. By reason of these facts he had acquired a reputation as a plow manufacturer. Upon the organization of complainant, he sold and transferred to it his stock of tools, machinery, iron, and other chattels, and said patent, and thereafter, until shortly before the change in name, and just after the application therefor had been made, he devoted his entire time, services, and attention to its business. During this time he invented three separate devices to be used in the manufacture of plows, one of which was a bolt with an oblong or oval head, and he assigned to complainant shop rights in each one of said patents. It was with his knowledge and consent, and through his active instrumentality, that his name was used in connection with the plow department of its business, and upon the plows made and sold by it, in the manner hereinbefore stated. In the year 1887 one E. C. Westervelt became a stockholder in the complainant. Its capital stock was increased to $60,000, owned or controlled one-half each by said Bissell and Westervelt. In the course of time Westervelt acquired charge of the financial affairs of complainant, and Bissell's duties became confined to supervising the manufacture of the plows. Finally, upon a proposition to buy or sell one-fourth of the stock at a certain figure, Bissell sold to Westervelt, and on March 31, 1891, resigned all official connection with complainant; retaining, however, one-fourth of its stock, which is still held by his estate. It was on the 21st of February preceding that the proceedings for a change in name were instituted, and the probability is that they were instituted in view of the coming severance of connection of Bissell with complainant. Mr. Westervelt testifies that the change in name was with Mr. Bissell's consent, and it is certain that he interposed no objection thereto.

At the time of this severance of connection, complainant's business covered

22 states, and in the year 1891 it sold 9,595 plows, as against 4,090 in 1885. In the manufacture of the plows which it was then making, and has since continued to make, it used said hot water process of chilling, and an improvement thereon not patented, and said patented devices. The plows which it has made and sold are largely chilled plows, though it has made, to a considerable extent, steel and cast plows.

On 16th day of July, 1891, said T. M. Bissell, in connection with others, incorporated and organized, under the laws of Indiana, a corporation with the corporate name of "The T. M. Bissell Plow Company," to carry on the business of selling plows of its own manufacture at South Bend, and at once entered upon said business, with said Bissell in charge, and continued in business until the latter part of 1892 or early part of 1893. It made and sold chilled, steel, and cast plows. In making the chilled plows it used a process known as "hot iron process," invented by said Bissell, and in making all its plows it used said patented devices, shop rights to which, at least, were assigned by said Bissell to said new company. The plows which it made were exact duplicates of those made by complainant. The parts of the plows made by it were capable of interchanging with like parts of like plows of complainant's. They were painted exactly like them, and had the same words, letters, and numbers which the corresponding plows made by complainant had. It issued circulars advertising its plows, of the same character, as to color, size, and shape, and containing the same statements and warranties, as those used by complainant in advertising its plows. Soon after it began business, complainant complained to it in regard to its manner of doing business. The complaint seems to have been limited to the manner of painting the plows, the use of the same words, numbers, and letters in marking them, and the issuance of said circulars. Upon said complaint being made, said corporation ceased to so paint or mark its plows, or to issue said circulars. No complaint seems to have been made of the corporate name of said company, or of its right to use it, or the name of said Bissell on the plows. Perhaps such complaint was not in order, so far as the use of the name of said company, or of said Bissell upon the plows was concerned, until it began to use them in another manner than it had theretofore used them. Thereafter it marked its plows in this manner: Upon one of the handles of all its plows it stenciled the words "T. M. Bissell," or "The T. M. Bissell," and upon the other of those that were chilled plows the word "Chilled." Upon the beams of those having wooden beams it stenciled the words "The T. M. Bissell Plow Co., South Bend, Ind.," or the words "The T. M. Bissell Plow Co.," and to the numbers it prefixed the number "1" and to the letters it affixed the letter "X." It also placed upon the handle or beam, or, perhaps, upon both, a mark which consisted of the head of a bolt made in accordance with said patent, and similar to the bolts used by it and complainant in making their plows. No complaint seems ever to have been made of this manner of marking the plows.

On the 23d day of July, 1892, Mr. Bissell died, and it was because of this fact, and probably, also, because it was financially embarrassed, said company ceased to do business, as hereinbefore stated. Thereupon complainant purchased from it certain beams and belting, a good many patterns, and a patent for a device in connection with making of plows, obtained by Mr. Bissell on the ———— day of ————, 1892, and which he had transferred to said company. These were all its effects which complainant deemed of any value to it, and it paid therefor the sum of $4,475.18.

One James Gallery had been engaged in the foundry and machine business at Eaton Rapids, Mich., from 1848 until his death, in 1882. For four years preceding his death, his son, the defendant Arthur D. Gallery, was in partnership with him, and they did business under the firm name of James Gallery & Son. Upon his death his son and widow succeeded to the business, and carried it on under the name of James Gallery's Sons. In connection with it they made and sold plows and repair parts in a small way; the plows which it made being known as the Curtis and Gallery plows. The output prior to 1893 of the Curtis plow was about 25 plows a year, and of the Gallery plow, which they began making in 1891, not more than 100 in all. In March, 1893, said Arthur D. Gallery learned through S. T. Green, of Charlotte, Mich., who

had been agent for complainant before the incorporation and organization of the T. M. Bissell Plow Company by said Bissell, and thereafter for said company, at said place, in the sale of their plows, that said company had ceased its business, and had certain effects to dispose of. He visited South Bend, and negotiated with said company for the purchase of the remnant of its effects which had not been purchased by complainant, and the right to use the name "The T. M. Bissell Company." On April 14, 1893, said Gallery, in connection with certain other citizens and residents of Eaton Rapids, Mich., incorporated and organized the defendant the T. M. Bissell Plow Company. On the 19th day of April the South Bend corporation executed to the Eaton Rapids corporation a written transfer of the right to use said name, and the remainder of said effects described therein, as consisting of patterns, patents, models, templates, and dies. The legal title to the three patents for devices, including said bolt with the oblong or oval head, was in the personal representative of said T. M. Bissell, his widow, and in pursuance of said sale she assigned them to said corporation. The consideration for said transfer was the sum of $1,500. At that time said South Bend corporation had a stock of manufactured plows at South Bend, Charlotte, Mich., and two points in Pennsylvania—those at Charlotte being in charge of said Green—and on the 5th or 6th of May thereafter it sold same to said Eaton Rapids corporation for a sum which, with said $1,500, amounted to $5,175.82. Upon said purchase being completed, to wit, on May 5, 1893, the defendant corporation caused to be printed and mailed from South Bend to the customers of the South Bend corporation a circular in these words:

"Office of the T. M. Bissell Plow Co.

"South Bend, Indiana, May 5th, 1893.

"To Our Patrons: We have disposed of all our patterns, chills, flasks, patents, manufactured stock and good will to the T. M. Bissell Plow Company of Eaton Rapids, Mich., where under the direction of the same skilled mechanics they will continue the manufacture of the T. M. Bissell Plows and repairs. We thank you for the liberal patronage accorded us in the past, and would ask a continuance of the same for our successors.

"Yours truly,          The T. M. Bissell Plow Company,
"By F. E. Bissell, Treasurer."

And the same date said S. T. Green caused to be printed and mailed from Charlotte to the plow trade in Michigan a circular in these words:

"Charlotte, Mich., May 5, 1893.

"To the Michigan Trade: It has come to our knowledge that certain parties have reported that we had sold out our plant to parties in South Bend, and that we were not building plows any more. This is a mistake and never had any foundation for truth. We simply shut down our works for a few days to make our removal. Wishing to increase our capital and enlarge our business we formed a large stock company at Eaton Rapids, Michigan, and removed our entire plant to Eaton Rapids (which enclosed circular fully explains). It seems that certain parties have taken advantage of this and reported that we had quit business. We now have everything moved to Eaton Rapids and in a very few days we will be in running order and with largely increased capital and a large plant we will be enabled to give you not only the celebrated T. M. Bissell Plows as before, but will improve our goods in every way that skilled mechanics and labor can conceive. It will be our aim to make various improvements and to keep pace with the times, and we hope to merit your continued patronage and good will.

"T. M. Bissell Plow Co.,
"Per S. T. Green, Charlotte, Mich.

"N. B. We wish to state further that Mr. S. T. Green of Charlotte, Mich., will continue in charge of the Michigan trade the same as before. Soliciting your continued patronage and good will, we remain as ever,

"Very truly yours,          T. M. Bissell Plow Co.,
"Eaton Rapids, Michigan."

It is claimed that this circular was issued by said Green without the authority, consent, or knowledge of the defendant corporation. It is significant, however, that it was issued simultaneously with the circular issued by it from South Bend, that Green was the person through whose instrumentality the purchase was brought about, and that he then had possession of its manufactured stock in Charlotte. He entered into a written contract to act as agent for the defendant corporation on December 26th thereafter. Thereupon the defendant corporation began to make and sell chilled, steel, and cast plows at Eaton Rapids of the same character as those made by the South Bend corporation, and to paint and mark them in the same way that it did, save that where it had stenciled on the beams of the plows the words "The T. M. Bissell Plow Co., South Bend, Ind.," the defendant corporation stenciled the words "The T. M. Bissell Plow Co., Eaton Rapids, Mich.," and that it removed the prefix "1" and affix "X" in all instances except 5, and has continued to do so ever since. And it now makes and sells at least 16 plows of the same style as those made by complainant, which are exact duplicates of those made by complainant. As soon as it began to do business, and as long as they lasted, it circulated price lists of the South Bend corporation, received from it at the time of the purchase, upon the margin of which it had placed the words "Office and works removed to Eaton Rapids, Mich." It also caused to be printed and circulated in the plow trade circulars in its name in which it described itself as "formerly of South Bend, Ind.," and also other circulars on which was a picture of T. M. Bissell, and reference is made to him in these words: "The inventor of chilled plows once made in South Bend, Ind., now only by The T. M. Bissell Plow Co., Eaton Rapids, Michigan." In addition to this, in the way of advertisement, it caused to be printed and circulated catalogues of the plows made and sold by it, and has ever since done so. On the front page of these catalogues is a picture of T. M. Bissell. Preceding a description of the plows referred to in it is a warranty which is word for word the same as the warranty in use by complainant long before T. M. Bissell severed his connection with complainant, and ever since, and an introduction in these words:

"The name of T. M. Bissell is as well known to the chilled plow trade as the name of Washington is to the people at large, and it is, therefore, unnecessary, in calling attention to the plows to which he gave his name and which contain the latest creations of his genius, to give in detail a history of his discovery of a successful method of chilling iron moldboards, or of the long years of unremitting study and experiment through which he toiled to bring to its present state of perfection a complete line of Chilled Plows. Neither does it seem necessary to relate the causes which resulted in the formation of an entirely new company after Mr. Bissell's death in 1892, and the removal of the works from South Bend, Ind., the scene of his activities for many years, to Eaton Rapids, Michigan, in the summer of 1893. For the purpose of general information and correcting any misapprehension or wilful misstatement in regard to the genuine quality of our goods, we beg to submit the following statement of facts:

"(1) We are the sole owners of all original patterns used in the manufacture of T. M. Bissell Plows in South Bend, Ind.

"(2) We are sole owners by virtue of assignment to us of all patents issued to T. M. Bissell used in constructing these plows, said original patents being in the possession of this company and subject to inspection at its office in Eaton Rapids.

"(3) We use the latest Improved Chill, devised by Mr. Bissell, and the mixture of metals and method of manufacture which after years of experiment, he finally adopted as being by far the best.

"(4) We employ skilled workmen, who were educated under the supervision and personal instruction of Mr. T. M. Bissell.

"(5) Every part of the T. M. Bissell plows will interchange with a like part of any plow of like number bearing the name of Bissell, and at the same time contain improvements not found in the old style Bissell Plows."

On two of the cuts of the plows contained in these catalogues are the words "T. M. Bissell Plow Co., South Bend, Ind." Upon all the circulars and every

page of the catalogues issued by the defendant corporation since its organization there is a cut of the head of said bolt, and until the fall of 1898, after it had received notice that complainant intended to sue it, on same was printed the words "The T. M. Bissell Plow Company, South Bend, Ind." .Thereafter they were changed to "The T. M. Bissell Plow Co., Eaton Rapids, Michigan." In all the circulars, catalogues, and other advertising matter issued by the defendant corporation since its organization the plows made and sold by it were and are referred to as "T. M. Bissell Plows."

Since the organization of defendant corporation, no descendant of said T. M. Bissell, or any one bearing the name of Bissell, has had any connection with defendant. In the introduction to the catalogues, hereinbefore quoted, it is stated that the defendant corporation employs skilled workmen, who were educated under the supervision and personal instruction of Mr. T. M. Bissell. The facts in regard to this are these: When the defendant commenced business it had with it three employés who had been with the South Bend corporation, and whom it brought from South Bend to Eaton Rapids. One of these acted as foreman or instructor, and the other two were molders. The foreman or instructor remained about three months. One of the molders was with defendant for about two years, though not continuously, and the other for a shorter period of time. For three or four years prior to the bringing of this suit, in 1899, no person who had ever had connection with the South Bend corporation has had any connection with defendant corporation.

Complainant became aware of the entry of defendant corporation into business at Eaton Rapids shortly after it started. In some way it obtained some of the circulars which had been sent out from South Bend May 5, 1893, to the customers of the South Bend corporation. It made no complaint or protest against anything that the defendant corporation was doing until about the year 1898. It consulted with attorneys in regard to its rights against said defendants as early as 1895, or perhaps earlier, and about the year 1898 it caused a bill to be prepared on its behalf against the defendants, by certain attorneys, to be filed in the state court, and a copy thereof to be mailed to the defendant corporation. Otherwise no complaint or protest was made by complainant prior to the institution of this suit in 1899.

Stuart MacKibbin (Edward Bacon and Dallas Boudeman of counsel), for complainant.

J. B. Hendee and Garry C. Fox, for defendants.

COCHRAN, District Judge, after making the foregoing statement, said:

These are the essential facts of this case. Are they such as to entitle complainant to all or either part of the relief sought?

There can be no doubt but that, when Mr. Bissell severed his connection with complainant, it had the right thereafter to continue to transact its plow business in the name of the Bissell Chilled Plow Works, and to mark its plows as it had been doing, against him as well as everybody else. In the case of William Rogers Mfg. Co. v. Rogers & Spurr Mfg. Co. (C. C.) 11 Fed. 498, Judge Lowell said:

"Both parties have fallen into the mistake of supposing that it was important to have a Rogers and his son, to authorize them to use the trademark, 'Rogers & Son.' The law is not so. Any one might use that trademark for the first time that it was used, and, if there was no Rogers in the same business, no Rogers could complain. Levy v. Walker, L. R. 10 Ch. D. 436; Massam v. Thorley's Cattle Food Co., 14 Ch. D. 748."

When it began to use said trade-name and to so mark its goods, there was no Bissell in the same business. The only Bissell who had been in the same business ceased to do such business, became connected with complainant, and gave his name to it. His thereafter

ceasing connection with complainant to the extent stated in no way affected its right to continue to use his name as it had been doing. Having that right, it certainly had the right to make the trade-name of its plow business its corporate name, and that apart from any consent of Mr. Bissell. But not only did complainant have such right (i. e., to use the name of Bissell in such ways); it also had the right to prevent the use of that name by others in the same business to the extent and upon the grounds now to be set forth.

It is well settled that, where two persons are engaged in selling goods of like character, one of them has no right to represent the goods which he offers for sale as the goods of the other, in order to facilitate the sale of his goods. Such a representation is an actionable wrong. Damages sustained thereby can be recovered, and its continuance can be enjoined. It is on this ground that a seller of goods, having a technical trade-mark, which he affixes thereto, can complain of another seller in the same business for affixing the same trade-mark, or an imitation thereof, to his goods. In the case of Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581, Mr. Justice Strong said:

"In all cases where rights to the exclusive use of a trade-mark are invaded, it is invariably held that the essence of the wrong consists in the sale of the goods of one manufacturer or vendor as those of another, and that it is only when this false representation is directly or indirectly made that the party who appeals to a court of equity can have relief. This is the doctrine of all the authorities."

And again:

"The first appropriator of a name or device pointing to his ownership, or which, by being associated with articles of trade, has acquired an understood reference to the originator or the manufacturer of the articles, is injured whenever another adopts the same name or device for similar articles, because such adoption is, in effect, representing falsely that the productions of the latter are those of the former. Thus the custom and advantages to which the enterprise and skill of the first appropriator had given him a just right are abstracted for another's use, and this is done by deceiving the public— by inducing the public to purchase the goods and manufactures of one person, supposing them to be those of another."

In the case of McLean v. Fleming, 96 U. S. 245, 24 L. Ed. 828, Mr. Justice Clifford said:

"Equity gives relief in such cases upon the ground that one man is not allowed to offer his goods for sale, representing them to be the manufacture of another trader in the same commodity. Suppose the latter has obtained celebrity in his manufacture; he is entitled to all the advantages of that celebrity, whether resulting from the greater demand for his goods, or from the higher price the public are willing to give for the article rather than for the goods of the other manufacturer, whose reputation is not so high as a manufacturer. Where, therefore, a party has been in the habit of stamping his goods with a particular mark or brand, so that the purchasers of his goods having that mark or brand know them to be of his manufacture, no other manufacturer has a right to adopt the same stamp, because by doing so he would be substantially representing the goods to be the manufacture of the person who first adopted the stamp, and so would or might be depriving him of the profit he might make by the sale of the goods which the purchaser intended to buy."

Indeed, what makes a mark affixed by a seller to goods produced or selected by him a technical trade-mark (i. e., one whose exclusive use

by him in marking goods of the same or like character will be protected) is that when it is affixed to goods of that character it amounts to a representation that they are the goods of the person who has adopted it as his trade-mark.   If it does not amount to such a representation, it is not a technical trade-mark.   In the case of Amoskeag Mfg. Co. v. Spear, 2 Sandf. 599, Judge Duer said:

"The owner of an original trade-mark has an undoubted right to be protected in the exclusive use of all the marks, forms, or symbols that were appropriated as designating the true origin or ownership of the article or fabric to which they are affixed; but he has no right to the exclusive use of any words, letters, figures, or symbols which have no relation to the origin or ownership of the goods, but are only meant to indicate their names or quality. He has no right to appropriate a sign or symbol which, from the nature of the fact it is used to signify, others may employ with equal truth, and therefore have an equal right to employ for the same purpose."

And in the case of Canal Co. v. Clark, supra, Mr. Justice Strong said:

"The office of a trade-mark is to point out distinctively the origin or ownership of the article to which it is affixed, or, in other words, to give notice who is the producer."

It is because they do not amount to such a representation that the various names which cannot be made use of as technical trade-marks are held not to be capable of such use.   In the case of Canal Co. v. Clark, supra, Mr. Justice Strong said:

"Nor can a generic name, or a name merely descriptive of an article of trade, or of its qualities, ingredients, or characteristics, be employed as a trade-mark, and the exclusive use of it be entitled to legal protection."

And again:

"And it is obvious that the same reasons which forbid the exclusive appropriation of generic names, or of those merely descriptive of the article manufactured, and which can be employed with truth by other manufacturers, apply with equal force to the appropriation of geographical names, designating districts of country.   Their nature is such that they cannot point to the origin (personal origin) or ownership of the articles of trade to which they may be applied.   They point only at the place of production, not to the producer, and, could they be appropriated exclusively, the appropriation would result in mischievous monopolies."

It is on this same ground that proper names can never constitute technical trade-marks.   A person of the same name may lawfully engage in the same or like business in which another is already engaged, and the use of the name will not necessarily denote that the goods to which it is affixed are the goods of such other person.   But as it is a wrong for one trader to pass off his goods as another's, and it is only because the use of another's technical trade-mark amounts to such a wrong that it is justiciable, it follows that, if such a wrong is done in any other way, it must be equally justiciable.   It is evident that such a wrong may be done by a rival trader to another—by a second comer to the first comer in the same trade—in other ways.   He may dress his goods in the same way in which the other does; he may mark them with the same name with which the other marks his goods, even though such name may not be capable of being made use of as a technical trade-mark; and he may do business in the same name.   Either

one of these things may be done by him in such a way and under such circumstances that the doing of them amounts to a representation that his goods are the goods of the first comer—just as much so as if he had marked his goods with a technical trade-mark belonging to the other. His action in such a case is not the violation of such a trade-mark, but is what is termed "unfair competition." In determining whether what he is doing or has done in either of these ways amounts to such a representation, and therefore constitutes unfair competition, the test is whether it is calculated to deceive intending purchasers of such goods—that they are the goods of the first comer. It is not necessary that it should be calculated to so deceive first or intelligent purchasers. It is sufficient that it is calculated to deceive ultimate or ordinary purchasers. And ordinary purchasers include incautious, unwary, and ignorant purchasers. The law has gone further than this, and prescribed a rule by which it can be determined whether what is done by the rival trader is calculated so to deceive such purchasers. That rule is that, if what is done by such trader causes his goods to be known in the trade by the same name by which such other goods are already known therein, it is calculated to deceive such purchasers. In the case of Seixo v. Provezende, L. R. 1 Ch. App. 192, Lord Cranworth, in referring to what resemblance to a technical trade-mark will constitute an infringement thereof, said:

"It would be a mistake, however, to suppose that the resemblance must be such as would deceive persons who should see the two marks placed side by side. The rule, so restricted, would be of no practical use. If a purchaser, looking at the article offered to him, would naturally be led, from the mark impressed on it, to suppose it to be the production of the rival manufacturer, and would purchase it in that belief, the court considers the use of such a mark fraudulent. But I go further. I do not consider the actual physical resemblance of the two marks to be the sole question for consideration. If the goods of a manufacturer have, from the mark or device he has used, become known in the market by a particular name, I think that the adoption by a rival trader of any mark which will cause his goods to bear the same name in the market may be as much a violation of the rights of that rival as the actual copy of his device."

The principle stated in the last sentence of this extract has often been quoted with approval or applied in subsequent cases. Johnson v. Bauer (C. C.) 79 Fed. 954; Read v. Richardson, 45 L. T. (N. S.) 54; Orr-Ewing v. Johnston, 40 L. T. (N. S.) 309; Id., L. R. 13 Ch. Div. 434; Johnston v. Orr-Ewing, L. R. 7 App. Cas. 219; In re Barker's Trade-Mark, 53 L. T. (N. S.) 23; Anglo-Swiss Condensed Milk Co. v. Metcalf, 3 R. P. C. 28; Wilkinson v. Griffith, 8 R. P. C. 370; Hutchinson v. Blumberg (C. C.) 51 Fed. 829; In re Worthington & Co.'s Trade-Mark, L. R. 14 Ch. D. 8; Cartier v. Carlile, 31 Beav. 292; Edelsten v. Edelsten, 1 De G., J. & S. 185.

The reason why it is held that the adoption by a second comer of any mark that will cause his goods to be known in the market by the same name as that by which the first comer's goods are already known, on account of his technical trade-mark, is an infringement thereof, is that thereby purchasers will be deceived into purchasing his goods for the goods of the first comer, the same as they would be by the use of an actual copy of the latter's technical trade-

mark. If, then, the use of any mark that will cause such an effect is an infringement of a technical trade-mark, it would seem to follow that, where no such trade-mark is involved, if what the second comer does in relation to his goods or business will have such an effect, it amounts to unfair competition. As in the other case, it causes his goods to be known in the market by the same name by which the first comer's goods are already known, and hence is calculated to deceive purchasers into buying his goods for that trader's goods, which is the test of unfair competition, as well as of infringement of a technical trade-mark. And it has been so held. It has been so held in cases where the first comer has marked his goods with a geographical name to such an extent and for such a length of time that they have become known in the market by that name. Cases of this sort are the cases of Wotherspoon v. Currie, L. R. 5 H. L. 508; Thompson v. Montgomery, L. R. 41 Ch. D. 35; American Waltham W. Co. v. U. S. W. Co., 173 Mass. 85, 53 N. E. 141, 43 L. R. A. 826, 73 Am. St. Rep. 263. The two former cases were cited with approval by the United States Supreme Court in the case of Lawrence M. Co. v. Tennessee Manufacturing Co., 138 U. S. 537, 11 Sup. Ct. 396, 34 L. Ed. 997. It has also been so held where the first comer has marked his goods with a personal name, either with his own or that of another, to such an extent and for such a length of time that they have become known in the market by that name. In cases where the second comer, who has so marked his goods or carried on his business that his goods have or are likely to become known by the same name, has been a person not of that name, but one who has adopted it as a business name, and marked his goods with it, it has been unhesitatingly held that his conduct amounted to unfair competition, and he has been made to pay damages for it, and enjoined from further use of such name in any respect whatever upon his goods or in connection with his business. Where the second comer is a corporation that has adopted such name as a part of its corporate name, the case has been treated as one where a person not of that name has adopted it as his business name, and marked his goods with it, even though some or all of its incorporators, stockholders, or officers may be of that name. For in such case it is the corporation, and not the individuals connected with it, that is doing business in that name, and marking its goods with it, and, before the adoption of the name by it, it had no such name. Cases of this sort are the cases of William Rogers Mfg. Co. v. Rogers & Spurr Mfg. Co. (C. C.) 11 Fed. 495; Le Page Co. v. Russia Cement Co., 2 C. C. A. 555, 51 Fed. 941, 17 L. R. A. 354; Meyer v. Dr. B. L. Bull Vegetable Medicine Co., 7 C. C. A. 558, 58 Fed. 884; William Rogers Mfg. Co. v. R. W. Rogers Co. (C. C.) 66 Fed. 56; Clark Thread Co. v. Armitage (C. C.) 67 Fed. 896; R. W. Rogers Co. v. William Rogers Mfg. Co., 17 C. C. A. 576, 70 Fed. 1017; Investor Publishing Co. v. Dobinson (C. C.) 72 Fed. 603; Clark Thread Co. v. Armitage, 21 C. C. A. 178, 74 Fed. 936; Fuller v. Huff, 43 C. C. A. 453, 104 Fed. 141, 51 L. R. A. 332; Wyckoff v. Howe Scale Co. (C. C.) 110 Fed. 520; Lamb Knit Goods Co. v. Lamb Glove & Mitten Co., 120 Mich. 159, 78 N. W. 1072, 44 L. R. A. 841; Chas. S. Higgins Co. v. Higgins Soap Co., 144 N. Y. 462, 39

N. E. 490, 27 L. R. A. 42, 43 Am. St. Rep. 769; De Long v. De Long Hook & Eye Co. (Sup.) 32 N. Y. Supp. 203; Penberthy Injector Co. v. Lee, 120 Mich. 174, 78 N. W. 1074; Holmes v. Holmes Booth & Atwood M. Co., 37 Conn. 278, 9 Am. Rep. 324; Meriden B. Co. v. Parker, 39 Conn. 450, 12 Am. Rep. 401; Williams v. Brook, 50 Conn. 278, 47 Am. Rep. 642. In cases where the second comer is of that name, and therefore has a right to do business therein, his use of the name in his business has been restricted. He has been required to refrain from characterizing his goods by that name by marks upon them, and in other ways to exercise precautions to prevent, so far as possible, his goods from being known in the market by such name. Cases of this sort are the cases of Pillsbury v. Pillsbury-Washburn F. M. Co., 12 C. C. A. 432, 64 Fed. 841; Walter Baker & Co. v. Baker (C. C.) 77 Fed. 181; Walter Baker & Co. v. Sanders, 26 C. C. A. 220, 80 Fed. 889; Walter Baker & Co. v. Baker (C. C.) 87 Fed. 209. The case of Fish Bros. Wagon Co. v. La Belle Wagon Works, 82 Wis. 546, 52 N. W. 595, 16 L. R. A. 453, 33 Am. St. Rep. 72, hardly seems to be in accord with the other cases. A case showing what use a second comer of the same name may make of his name in this business is that of Duryea v. National Starch Mfg. Co., 25 C. C. A. 139, 79 Fed. 651.

Such, then, being the law of unfair competition in relation to the use of personal names, it follows that the original T. M. Bissell Plow Company, the South Bend corporation organized by Mr. Bissell after he severed connection with complainant, had no right to adopt that as its corporate name, or to do business in that name, or to mark the plows manufactured by it with the name "Bissell" in any connection whatever. The fact that it was organized and managed by Mr. Bissell conferred no such right upon it. It was precisely the same as if one not of that name had undertaken to manufacture plows under that name, and to mark them with it. Much more did the defendant corporation have no right to adopt that name as a part of its corporate name, or to transact its business in that name, or to mark its plows with it. No one of the name of Bissell was ever connected with it, and the South Bend corporation, itself having no right to use the name in any way, had no power to confer the right to use it upon said defendant. The want of right in the South Bend corporation and its alleged successors, the defendant corporation, to use the name, was due to the fact that at the time of the organization of the former, by reason of the extent and length of time that complainant had used the name "Bissell" in connection with its plow business, the plows manufactured by it had become known in the market as "Bissell Plows," and the use of such name by said corporations would cause the plows made by them to be known in the market by the same name. The use of the name by them, therefore, was calculated to deceive purchasers of plows into believing that their plows were the plows of complainant, and thus pass them off as complainant's plows. The fact that they always prefixed "T. M." to the word "Bissell" when used on the plows, and they advertised their plows, is a witness to the fact that complainant's plows were known in the market as "Bissell Plows." It is an attempt to make a distinction from something al-

ready existing. Yet that distinction was not sufficient to cause the plows manufactured by them to be known in the market as "T. M. Bissell Plows," as distinguished from "Bissell Plows," or to prevent them from being known in the market as "Bissell Plows," the same as complainant's plows were. That in fact the plows of the defendant corporation did become known in the market simply as "Bissell Plows" is shown by at least two items of evidence in the record. They show that the defendant corporation itself was in the habit of referring to the plows manufactured by it by the name of "Bissell." One is a letter from the defendant corporation to the Hinsdale Transfer Company, of Hinsdale, Mich., dated March 29, 1894. The opening sentence of that letter is in these words:

"In reply to your favor of yesterday we beg to say; we are pleased to hear that the Bissell Plows in your territory are giving good satisfaction and that for that reason you are led to wish to secure the agency; so far as our knowledge extends that is the universal verdict, except where the use of inferior material has caused breakage of parts."

The other is contained in the form of contract with its agents in use by the defendant corporation. In that contract the articles covered by it are referred to as "Bissell Plows and Repairs."

No doubt, Mr. Bissell had the right, upon severing connection with complainant, to go into the plow business again on his own account, and transact it in his own name, with such restrictions and precautions in regard to the use thereof, in relation to his business, as would prevent, as far as possible, his goods being taken for complainant's, and thus avail himself of his reputation as a plow manufacturer. But that he did not do. And whether he did so or not, this is not a case against him, but against the defendant corporation. It is not a case involving the right of a person to use his own name, but the right of a corporation formed and managed by persons not of that name to use the name. The line of authorities cited by counsel for defendants, involving the right of a person to use his name in his own business, are not, therefore, pertinent to this case.

Counsel for defendant urges that the fact that complainant and defendant corporation are not located at the same place, affects complainant's right to complain of said defendant's use of the name "Bissell," and they cite in support of this contention the cases of Cady v. Shultz, 19 R. I. 193, 32 Atl. 915, 29 L. R. A. 524, 61 Am. St. Rep. 763; Nebraska L. & T. Co. v. Nine, 27 Neb. 507, 43 N. W. 348, 20 Am. St. Rep. 686; Investor Publishing Co. v. Dobinson (C. C.) 82 Fed. 56; Hazelton Boiler Co. v. Hazelton Tripod B. Co., 137 Ill. 231, 28 N. E. 248; Fish Bros. Wagon Co. v. La Belle Wagon Works, 82 Wis. 546, 52 N. W. 595, 16 L. R. A. 453, 33 Am. St. Rep. 72. In the first three cases the rivals were not engaged in the business of selling goods. In the first case they were rival dentists; in the second, rival bankers; and in the third, rival publishers of a newspaper. What was complained of in each case was the doing of business by the second comer in the same, or substantially the same, name. The fact that the rivals were engaged in separate communities was alluded to as a circumstance bearing upon the question as to the right of the first comer to enjoin the second comer from using the same business name. These

121 F.—24

cases have no bearing upon a case where the rivals are engaged in selling goods in the same open market, and are marking their goods with the name in which they are doing business. That in such a case the fact that the rivals live in separate communities, more or less distinct from each other, should have no special significance, was recognized in the Nebraska case. Judge Reese said:

"It cannot be that the same reason for the rule exists in cases of this kind as in cases of trade-marks. In trade-mark cases there is a commodity manufactured, or in some way prepared for the general market. In such cases it is due both to the public and to the first manufacturer that, if he furnish a superior quality of goods or wares, the former be protected from fraudulent imitation; the latter, from the destruction of a trade he has built up at great expense and labor, and by honesty in his manufacture. The products of the new enterprise should stand upon their own merits in their race for favor in the markets to which they are sent. In Spring Co. v. Spring Co., 45 N. Y. 291, 6 Am. Rep. 82, an injunction was granted against the defendant for bottling and placing upon the market a water with a name similar to that of the water bottled and sold by the plaintiff. The plaintiff was the owner of what was denominated the 'Congress Spring' property in Saratoga, and for a number of years it had been engaged in bottling and selling 'Congress Water.' The defendants were organized as 'The High Rock Congress Spring Company,' and were engaged in bottling and selling 'High Rock Congress Spring Water,' and so labeling its products. An injunction was allowed, for the reason that the word 'Congress,' from long use by the plaintiff, became its legitimate property as a trade-mark, and as indicating the origin and ownership of the water flowing from the Congress spring. Hier v. Abrahams, 82 N. Y. 519, 37 Am. Rep. 589, was to restrain the defendant from the appropriation of a trade-mark upon the label of manufactured cigars, and an injunction was allowed. Pierce v. Guittard (Cal.) 8 Pac. 645, 58 Am. Rep. 1, was to restrain an infringement upon a trade-mark used for manufactured chocolate, and the same principles were held to apply. The rule applied to the above cases runs through the line of cases where the manufactured or prepared product is placed upon the open market in competition with other articles of the same character or kind. But we think it does not apply to the case at bar. In this case a different principle is involved. The damages, if any, inflicted upon the public, could not be by the devices referred to. The place of business of defendant, being so remote from plaintiff, would seem to preclude the idea of such damage resulting to plaintiff, considering the character of the business in which the parties desire to engage. The nature of the business transacted by the companies is such that, considering the distance between their principal offices, there can be no substantial conflict of interest."

In the Illinois case the rivals were sellers of boilers—one being located in New York, and the other in Chicago. The defendant was the first comer. But that apart, the thing complained of was that the defendant was doing business in substantially the same name as complainant. There was no complaint that defendant was otherwise doing anything that would affect complainant's business. It did not appear that complainant's goods had become known by the name in which it did business. Bailey, J., said:

"There is evidence tending to show that the boilers which Kennedy and Hazelton manufactured and sold were known from the first, to some extent, at least, as 'Hazelton Boilers,' and that said firm so denominated them in their advertisements and circulars; but these facts do not show the adoption of those words or of the word 'Hazelton,' as either a trade-mark or trade-name. A trade-mark owes its existence to the fact that it is actually affixed to a vendible commodity. Browne, Trade-Marks, § 31. There is no evidence, or, if there is any, it is exceedingly slight, that the words 'Hazel-

ton Boiler' or 'Hazelton' had been actually affixed to the boilers as a trademark prior to July 10, 1884. The mere adoption of said words in advertisements and circulars gave said firm no exclusive right to their use."

And again, as a further distinction, the goods of the respective rivals were not sold in the open market. Bailey, J., said:

"We are also of the opinion that there is a failure by the complainant to show any improper interference by the defendant with the complainant's business of manufacturing and selling steam boilers. The complainant's place of business is in the city of New York, while that of the defendant is in the city of Chicago. Neither puts its steamboilers on the market to be sold by retailers or middlemen to the final purchaser, but both deal directly with customers who purchase boilers for their own use, and who give their orders directly to the complainant or defendant, as the case may be. In this way the liability of intending purchasers to be deceived into mistaking boilers of the defendant's manufacture for those of the complainant, if not wholly obviated, is reduced to the minimum. It is difficult to see how purchasers of ordinary intelligence, dealing directly with the manufacturers, could be misled into confounding two such establishments, situated nearly 1,000 miles apart."

Then as to the Fish Case, that, as we have heretofore pointed out, was a case involving the right of the second comer to use his own name in his business, and is hardly in line with the weight of authority applicable to cases of that kind. This is a case of two rivals engaged in the same business, selling their goods in the same open market, and each using the same name to mark their goods as well as doing business in the same name; i. e., the name of "Bissell." I don't think that the fact that their places of manufacture are in separate communities affect their rights, and no authority has been cited to the effect that it does.

Counsel for defendant urges further that complainant is not entitled to any relief because the defendant corporation have been free from fraudulent intent to appropriate to its use any part of complainant's business. It must be conceded that in the circulars that were issued on May 5, 1893, and the further circulars and catalogues which were issued by it in advertising its business, it stretched the truth in regard to its connection with the T. M. Bissell Plow Company, of South Bend, and T. M. Bissell, if not in relation to the complainant. This, however, it is claimed it did in order to hold on to business which it was believed to belong to said South Bend corporation, and perhaps to get the benefit also of Mr. Bissell's reputation. This is possibly true, and it is further possible, if not probable, that the defendant believed in good faith that it had a right to do business in the name of T. M. Bissell Plow Company, and to mark its plows with the name of Bissell. But it is not reasonable to suppose that the defendant corporation did not know that by the use of the name of Bissell it must necessarily obtain a part of complainant's business, and that it intended thereby to realize all the benefits which might accrue to it out of its use. However this may be, it knew that complainant's plows were widely and extensively known as Bissell Plows; that that name had become impersonalized, and had come to mean plows made by complainant; and, with this knowledge, it gave its plows the same name, and put them on the market with it. This it had no right to do. In so doing it entrenched upon complainant's rights, and counsel for de-

fendant concedes that, where the conduct of a rival trader is necessarily a wrongful injury, the question of fraudulent intent ceases to be important.

In the case of McLean v. Fleming, supra, Mr. Justice Strong said: "Positive proof of fraudulent intent is not required where the infringement is clear, as the liability of the infringer arises from the fact that he is enabled, through the unwarranted use of the trade-mark, to sell a simulated article as and for that which is genuine," and cites, in support of this the case of Wotherspoon v. Currie, supra, which, as we have seen, is a case of unfair competition.

In the case of Walter Baker & Co. v. Baker (C. C.) 77 Fed. 181, Judge Paul said:

"The respondent, in his answer and in his testimony, avers that he had no intention of infringing on the rights of the complainant. He has taken the testimony of a number of witnesses to prove his high character as a citizen and business man. In the argument great stress is laid upon this testimony by respondent's counsel, as negativing the idea of a fraudulent purpose on the part of the respondent in dressing up his goods in imitation of the complainant's. The court cannot give to this evidence the weight to which counsel insist it is entitled. It must in this case, as in every case where intent is the subject of investigation, deduce the intent from the acts of the respondent. These constitute the proof as to the purpose of the respondent, and by them the court must be guided."

In the case of The Le Page Co. v. Russia Cement Co., supra, Judge Putnam said:

"The plaintiff in error submits that, in order to maintain this suit, it is necessary to show that it knew of the existence of a trade-mark, that it intended to palm off its goods as those of the Russia Cement Company, and that the public was deceived thereby. This might be true if the only case shown by the proofs was that of an actual purpose to mislead the public to the injury of the Russia Cement Company; but, as we place the case on the proposition that, under the circumstances, the use of the words 'Manufactured by The Le Page Company,' in connection with the word 'Glue,' is necessarily a wrongful injury to the Russia Cement Company, which ought to have been foreseen by Le Page and the Le Page Company, we have not deemed it necessary to go into the controverted question of actual fraudulent intent or artifice, or to weigh the evidence on that point. Positive proof of fraudulent intent is not required where the proof of infringement is clear, as the liability of the infringer arises from the fact that he is enabled to sell a simulated article as and for the one which is genuine."

In the case of Wirtz v. Eagle Bottling Co., 50 N. J. Eq. 164, 24 Atl. 658, Van Fleet, V. C., said:

"He further says that in designing the defendant's labels he had no purpose or design of palming off the defendant's goods for those of the complainant. Admitting all this to be true, it is manifest it constitutes no defense. The vital question in cases of this kind is not, what did the defendant mean? but what has he done? The legal quality of an act resulting in injury must be decided, not by the motive with which it was done, but by the consequences which have necessarily resulted from it. The law, in civil cases, does not attempt to penetrate the secret motive which induced the act brought in judgment, but judges of its legal quality solely by the consequences which have naturally and necessarily proceeded from it. It is no less a dictate of justice than of sound reason that every person must be understood to have intended to do just what is the natural consequence of his act deliberately done. The aggrieved person, in cases of this class, is not required to show intentional fraud, but he makes a sufficient case to give him a right to pro-

tection when he shows that the defendant is using his label, or one so nearly like it as to render deception of the public and injury to himself probable."

Counsel for defendant further urge that complainant has failed to make out a case because there is no evidence of any purchaser having been actually deceived into purchasing defendant's plow believing it to have been complainant's. This however, was not necessary, so far as its right to injunctive relief is concerned. In the case last cited Van Fleet, V. C., said further:

"Neither is he required to prove that persons have actually been deceived, and that his adversary's goods have been purchased under the belief that they were his. If it appears that the resemblance between the two labels is such that it is probable, in the sale of the goods of the parties, the one will be mistaken for the other, enough is shown to make it the duty of the court to interfere."

In the case of Von Mumm v. Frash (C. C.) 56 Fed. 837, Judge Benedict said:

"It is further to be observed that, although in the case decided by the New York Court of Appeals there was no testimony from witnesses that in the trade the defendant's manufacture had been taken for the other, the danger of such mistake was held sufficient to call for the interference of the court. See, also Braham v. Beachim, 7 Ch. Div. 856. That case, therefore, overthrows the objection taken here that there is no evidence of any instance where a person has been defrauded by the method adopted by the defendant in dressing up their manufacture. In a case like the present it would be too much to require the complainants to prove instances of such deception. It is not likely that the knave who perpetrates the fraud upon the ultimate consumer will disclose himself to the complainants; and the ultimate consumer, if cognizant of the fraud practiced upon him, could not, unless by mere accident, be known to the defendants. Such testimony is unnecessary where, as here, the proofs warrant the conclusion that the only reason for the dress adopted by the defendants for their product is that it can be successfully used to defraud the ultimate consumer. Moreover, it is not to be disputed that danger of injury to the complainants is created by the defendants' method of dressing up their article, and danger of injury is sufficient ground for the interposition of a court of equity."

And in the case of Fuller v. Huff, supra, Judge Shipman said:

"It is not necessary for the complainant to attempt to discover whether a purchaser had been actually deceived, for a manifest liability to deception exists."

This case, however, is not wanting in evidence of deception, slight though it may be. The defendants introduced one R. H. Hupp, a former traveling salesman of complainant, as a witness. He testified that he never knew of any confusion between complainant's and defendant's goods. On cross-examination he identified six reports made by him to complainant whilst acting for it. In one, dated October 7, 1891, whilst the South Bend corporation was doing business, is this statement:

"Robertson was here over night, and contracted with them, selling them four plows. When I called on them this a. m. they said, 'Why, one of your men just contracted with us this morning.' On looking at contract I saw who it was. They thought they were contracting with us."

In another report, dated November 28, 1893, after defendant corporation began business, is this statement:

"This is the first place I have found where the T. M. people have been. J. L. W. contracted with them, thinking he was contracting with us. He bought quite a lot of goods from them in the fall, not knowing the difference. I believe it a good idea to mail a letter to each dealer telling them that you have not moved away, etc., etc. I have been asked the question several times."

The defendant, Arthur D. Gallery, was asked on direct examination this question:

"State whether or not defendant corporation experienced any trouble in the way of confusion of mail, that is, in the way of receiving mail which should have gone to complainant corporation?"

To it he answered:

"Very little. From 1893 to 1896 we received not more than six letters intended for complainant corporation. These were immediately forwarded to it, but we never received any which had been by mistake sent to complainant."

Frank E. Brown, a jobber and retailer of plows at Grand Rapids, Mich., and a witness for defendants, testified on cross-examination:

"Q. You say that you always explain the difference between the defendants' and complainant's plows? A. I did not say that I explained the difference between the plows. Q. What did you say? A. That we explained the difference between the companies; that we were selling the T. M. Bissell Plow made at Eaton Rapids. Q. You find it necessary to explain that there are two companies? A. It was for a year or two, until people got acquainted with the fact that there were two companies."

Samuel E. Bolton, a witness for complainant, who at one time sold plows for both complainant and defendants at Niles, Mich., testified on cross-examination:

"Q. The T. M. Bissell Plow Company's plows were plainly marked, were they not, 'The T. M. Bissell Plow Company, Eaton Rapids, Michigan'? A. They were. Q. And the Bissell Chilled Plow Works plow was plainly marked 'Bissell Chilled Plow, South Bend, Ind.'? A. Yes, sir. Q. Do you claim that you were able to sell customers the T. M. Bissell plow, marked as it was, as being a Bissell chilled plow of South Bend manufacture? A. The farmers seemed to be unable to recognize the difference without their attention being called to it. (Question repeated.) A. I said the farmers seemed to be unable to recognize the difference without their attention being called to it. And I will add, further, that we sold both as Bissell plows. (Question repeated.) A. The farmers failed to recognize the difference without their attention was called to it. (Question repeated.) A. I answer it as I answered before. Q. During the four years that you were engaged in business there about how many Bissell chilled plows were you enabled to palm off upon your customers as being T. M. Bissell plows? A. I, of course, perhaps haven't the right to object, but the question looks a little as though we were trying to show deception. I will simply state that if we failed at the time a customer wanted a certain number of plow, and we did not have it in stock, we would come over and buy one of the Bissell Chilled Plow Company and deliver it to the customer. Q. And would the customer suppose he was buying a T. M. Bissell plow? A. The customer would suppose that he was buying a Bissell plow, would know he was buying a Bissell plow, and would know no difference unless we had called his attention to the plow being marked 'T. M. Bissell.' Q. Now I will ask you again how many plows you were enabled to palm off in that way upon your customers; how many Bissell chilled plows? A. I am not prepared to answer definitely. Q. About how many? A. Perhaps a dozen plows."

This evidence shows that purchasers have been deceived into buying defendants' plows for complainant's; just what one would ex-

pect to have been the case if there had been no direct evidence of it.

And, finally, it is urged by defendants' counsel that complainant has lost all right to any relief by reason of laches.   It appears from the evidence that complainant became aware of the fact that defendant corporation had entered into the plow business shortly after it commenced, and continued aware of its being in that business, and its method of doing business, ever afterwards.   This suit was not brought until 1899, about six years after the defendant corporation commenced business.   About 1895 complainant began to advise with counsel as to its rights, but it never informed defendant corporation of any question as to its rights until the year 1898, when it caused to be sent to said defendant a copy of a bill that it intended filing in the state court against it.   The effect of laches in cases of this character is so well settled by the decisions of the Supreme Court in the cases of McLean v. Fleming, supra; Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526, and Saxlehner v. Eisner, 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60, that the question is not open for discussion.

Simple laches, without more—which is the case here—is not sufficient to interfere with a complainant's right to injunctive relief, though it may affect his right to damages for past infringement.   Counsel for defendants urge that it will affect complainant's right to injunctive relief where there is an absence of fraudulent intent on defendants' part, and that in this case there was absence of such intent.   If fraudulent intent involves knowledge that it did not have a right to do as it did, there may have been an absence of fraudulent intent in this case.   As I have before said, it is possible, if not probable, that defendants in good faith believed that they had a legal right to do as they have been doing.   However this may be, it is certain that it intentionally adopted complainant's trade name—invaded his property— and that, in itself, in the eye of the law, was a fraud on its part.   They must have known, also, that what they were doing had a tendency to, and in all reasonable probability would, pass off their goods as complainant's, and thus enable it to obtain a part of complainant's trade. It is a presumption that one intends the reasonable and probable consequences of his acts, so that I cannot avoid the conclusion that the defendant has intentionally appropriated to itself so much of complainant's business as it has been enabled to attract to itself by the means complained of.   As said by Mr. Chief Justice Fuller in the case of Menendez v. Holt, supra:

"The intentional use of another's trade-mark is a fraud, and, when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it.   Persistence, then, in the use is not innocent, and the wrong is a continual one, demanding restraint by judicial interposition when properly invoked."

But it does seem to me that the laches has been sufficient to defeat complainant's right to damages for past infringement within the doctrine of the cases of McLean v. Fleming, supra, and Menendez v. Holt, supra.

My decision therefore is that complainant is entitled to the injunctive relief prayed, and that its claim for damages be dismissed.