## VON FABER et al. v. FABER.

### (Circuit Court, S. D. New York. August 18, 1903.)

**1. UNFAIR TRADE—USE OF NAME.**

Plaintiff was the successor of the original Faber pencil manufacturing business, established in 1761, which business became and is widely known under the name "A. W. Faber," who succeeded the originator of the business. Thereafter defendant's father, Eberhard Faber, was appointed sole agent for the United States of the German house of Faber, and was authorized to manufacture a low grade of lead pencils, but was never given the right to use either the name "Faber" or "A. W. Faber." Defendant's father, however, wrongfully labeled certain of his pencils with the name "Faber," and defendant, on succeeding to his father's business, over plaintiff's protest, continued to label his pencils "E. Faber," "Faber," "Faber Pencil Company," and "Eberhard Faber Pencil Company," which resulted in misleading plaintiff's customers to think that defendant's pencils were manufactured by the original house of Faber. The agency was subsequently terminated by reason of these practices, and defendant subsequently signed a written contract agreeing not to use the word "Faber" without the word "Eberhard," or the initials of defendant's first name. Defendant, however, failed to comply with this contract, and continued to stamp his pencils as before. *Held*, that defendant was guilty of unfair trade, and that plaintiff was entitled to an injunction restraining him from using the word "Faber" without the prefix "Eberhard" or "John E." or "J. Eberhard."

**2. SAME—FAMILY NAME.**

Where a family name has become a trade-mark applied to a manufactured article, no special right to use the same accrues by virtue

¶ 1. Unfair competition, see notes to Sheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.

of the relation which descendants bear to the original manufacturer of the same name; such descendants being entitled to use such family name only in connection with some distinguishing name or initial where the use of the surname alone would create unfair competition in trade.

## In Equity.

The bill of complaint was filed, praying a writ of injunction enjoining the defendant, his servants, etc., from making, selling, or causing to be made or sold, or advertising, or causing to be advertised, any lead pencils, erasive rubber, rubber bands, etc., bearing on said goods, or on the labels, wrappers, boxes, or other coverings affixed thereto, or in which they are contained, stamp lettering, or other marks, containing the name of "Faber," or "Faber Pencil Company," or any like or kindred designation in which the name "Faber" is used without the prefix "Eberhard," or in which the name "Faber" is used, associated with "Eberhard Faber," or "E. Faber," or otherwise, in such a way as likely to cause a purchaser or consumer to believe that the defendant's business is complainants' business, or that defendant's goods are the original Faber goods, or the products or goods of these complainants or of their predecessors in business. The gist of the charge of the complaint is that the defendant is wrongfully and unlawfully using the name "Faber" in the manufacture and sale of lead pencils, to the confusion of the public, and the great damage and injury of the complainant and its business. The bill of complaint also demands an accounting and a judgment for damages.

Fred. W. and Alfred E. Hinrichs (Frederic W. Hinrichs, of counsel), for complainants.

Forbes & Haviland, for defendant.

RAY, District Judge (after stating the facts as above). The house of A. W. Faber was established in 1761, and is one of the oldest and best-known houses engaged in the manufacture of pencils in the world —possibly the oldest and the best-known house. The central seat of its business is at Stein, Bavaria, where its pencil manufactory is situated. As a lead-pencil manufacturer and dealer, the house is principally known. This house started business on a moderate scale, which grew to enormous proportions. At the present time it has more than one factory, and branch houses at Berlin, Paris, London, and New York, with agencies at other large and central cities. In a circular issued by the defendant about the year 1890, and which is in evidence, a condensed history of the house is given as follows:

"Kasper Faber settled in the little village of Stein, near Nuremberg, and there commenced the manufacture of Faber's pencils in 1761. He carried the weekly product of his factory to Nuremberg in a hand basket. But the high price paid for his goods furnished the best proof of their early superiority. Anthony William Faber, whose name the firm bears to this day, succeeded his father, Kasper Faber. The business gradually grew under the successive owners, but under the management of Mr. John Lothar Faber, who afterwards became Baron Lothar von Faber, the business increased rapidly. He associated with him his two brothers, Mr. Johann Faber, who remained at Stein, and Mr. Eberhard Faber [the father of this defendant], who came to the United States, and established a branch house in New York, in which was centered the trade of North America. In 1861 a centennial festival was held at Stein, in which employers and employés joined. All of the Faber's pencils used in the United States were made in Germany or here in New York, the more expensive ones being the imported pencils. The graphite used in making the very best pencils was drawn from Siberia."

The defendant, having the same family name as the complainants, has, it is contended, failed to use his name when competing with the complainants, A. W. Faber, in such a way as to differentiate his establishment and his goods from those of the complainants; and the charge is that the defendant simulates complainants' mode and manner of putting up and placing on the market its most popular lines of pencils. The complainant contends that the defendant tends to breed and has bred confusion in the market, and caused purchasers and users of lead pencils, etc., to purchase the goods made and sold by the defendant, when they desired to purchase and use the goods made by the complainant.

The evidence in this case, which is very voluminous, shows that formerly the relations of the defendant's house to the complainants' house were those of sole agent for the United States, in a very broad and comprehensive sense. For many years the father of the present defendant was the sole agent for the United States of the complainants' predecessor, and there was not only a business but a family relationship. In the beginning and for many years the A. W. Faber house furnished capital for the defendant's predecessor, including manufactured goods, and the defendant house sold the A. W. Faber house goods; but after a time the defendant house was given the right to manufacture and sell a low grade and inferior quality of lead pencils, but was not given the right ever to use either the name "A. W. Faber" or "Faber." After a time the defendant, formerly known as John Robert Faber, John Eberhard Faber, also known as Eberhard Faber and E. Faber, following out certain practices in which his father, as agent for the plaintiff house, had indulged, began to use the name "Faber" upon lead pencils, and in connection with other stationary goods which he was making and selling in the United States on his own account and for his own profit and gain, in competition with the plaintiff house; the agency having been terminated March 31, 1894, because, mainly, of the alleged wrongful and illegal practices of the defendant. The defendant has made, against the protest of the complainant, the principal lines of A. W. Faber's pencils, distinctly imprinted and labeled "E. Faber"; and these lines of pencils have been made of the same size and shape as complainants' pencils, and the same quality of pencils have been put up in packages of the same size and shape, with labels of the same color and markings, and in such a manner as to actually confuse the public, and induce those who desire to purchase the A. W. Faber pencils to purchase the pencils made by the defendant. In the manner mentioned, and by using the name "E. Faber" instead of the name "Eberhard Faber," the trade has been easily misled, and, to quite an extent, in different parts of the United States; many persons having purchased the defendant's pencils, believing they were purchasing the A. W. Faber pencils. These practices, persisted in by the defendant, have not only injured the complainant in its business, but, if allowed, will still further injure the complainant. The court is satisfied that these practices of the defendant have been persisted in and were adopted for the purpose of taking away and injuring the legitimate business of the complainant. The defendant knew that the house of A. W. Faber had come to be known

generally as the Faber House, or the House of Faber, and that its pencils were known the world over, wherever used, as the Faber pencils.

The defendant has not used his full name in designating his goods, nor has he used the initials "J. E. Faber." The defendant, in putting up and packing his goods for the market, has in many instances extensively so packed them and so placed the labels about packages as to conceal from the ordinary observer the initial "E.," and in this way has still further confused the public and purchasers, and caused his product to be purchased, sold, and used as the Faber pencil, the purchasers and users believing that they were purchasing the goods of the ancient, established house of A. W. Faber. Formerly the defendant, in his ordinary correspondence and in his business and social relations, gave and used and signed the name "John Eberhard Faber," and it was mainly, if not entirely in connection with the practices above mentioned, which interfered with and seriously affected and injured the business of the house of A. W. Faber, that the defendant used the name "E. Faber."

As early as the year 1897 the attention of the defendant was called to his unfair methods of trade and competition in the pencil business and in the rubber stationery business. The defendant denied that he had misused the name of Faber, and denied that there had ever been any agency on the part of his house for the house of A. W. Faber; and the defendant then claimed that the numbers on the pencils had been devised by him (the defendant). It appears from the evidence that the defendant, in carrying on his business, has used the same numbers on certain goods or qualities of pencils used by the house of A. W. Faber, for the same grade and quality of pencil. The defendant also used the words "Faber Pencil Co." and the words "Faber Pencil Works" to designate his works, business, etc.—substantially the names that had been used by the defendant, as agent for the plaintiff house, to designate the business, etc., of the complainants. In 1894, and before the dissolution of the agency, the defendant had agreed that all pencils made by him should be sold under the name of "Graphite Pencil Co." For many years, while the agency continued, A. W. Faber had permitted the defendant and his predecessors to counterstamp the A. W. Faber lead pencils with the words, "E. Faber, New York, sole agent." In this way the words "E. Faber" had for many years prior to the dissolution of the agency been associated with the name "A. W. Faber," and with the pencils made and sold by the complainant house. Hence the use by defendant of the name "E. Faber," when he came to set up the pencil business for himself, does not, in fact, distinguish the business or the pencils of the defendant from those of the complainant.

Formerly and generally during the agency, pencils, pencil cases, and rubber goods were advertised as "A. W. Faber's Domestic Pencils," "A. W. Faber's Gold Pens and Pencil Cases," "A. W. Faber's Rubber Goods," while penholders and miscellaneous stationer's articles were advertised as "E. Faber's," he conducting a business in that line for himself. All pencils of foreign or domestic

make were labeled "A. W. Faber," when they bore the name "Faber" at all. About 1895 or 1896 the word "Faber" was introduced by defendant into price lists, etc., of rubber goods. Instead of "A. W. Faber's Rubber Goods," we have "Faber's Rubber Goods." These rubber goods were made by C. Roberts & Co. for A. W. Faber and for Eberhard Faber. It was after or at about the time the defendant became a partner in the firm of C. Roberts & Co. that he made this change. The defendant, while agent for A. W. Faber, claimed that the word "Faber" was the very essence of the designation of A. W. Faber's goods. About the year 1895 or 1896 the defendant commenced to apply the name "Faber" alone to his goods.

In March, 1898, a contract or agreement was made as follows:

"Between the firm A. W. Faber, represented by Baroness Ottilie von Faber in Stein, as proprietress, and the firm Eberhard Faber, represented by Mr. Lothar W. Faber, in as partner, the following agreement was made to-day.

"Par. 1. The firm of Eberhard Faber is indebted to the firm A. W. Faber, as a result of the business relation formerly subsisting between them in the total sum of $200,000, subject to interest at 4%. For this amount a mortgage has been recorded in the name of Baron Lothar von Faber, the late owner of the firm A. W. Faber, on the property Nos. 541, 543, 545 and 547 Pearl Street, New York; and by agreement of February 26th, 1894, the firm of Eberhard Faber has undertaken to reduce this mortgage to $100,000, and to repay during the years 1896, 1897 and 1898, respectively, one-third part of these $100,000. The interests accruing out of the above $200,000 were paid by the firm of Eberhard Faber down to the end of the year 1897. But the payments agreed upon on account of capital have remained in default, and the firm of A. W. Faber has, therefore, brought suit against the firm of Eberhard Faber to enforce the payment of the two-thirds remaining due and payable for the years 1896 and 1897.

"Par. 2. Baron Lothar von Faber being deceased and having been succeeded by his widow, Ottilie von Faber, as heir; and said Pearl Street property, referred to in paragraph 1, having likewise passed in the meanwhile to Mrs. Jenny Faber, mother of the former proprietors; it is hereby agreed that a new mortgage is to be executed to Baroness Ottilie von Faber in the amount of $200,000, for the term of three years, during which time the mortgagee shall have no right to call for payment of the principal debt, which is to bear interest at 4% and be secured on the property in Pearl Street above described. To render this possible, measures are to be taken exactly in accordance with proposals already made and communicated during the last year by Messrs. Fred W. & Alfred E. Hinrichs on behalf of the firm of A. W. Faber to the firm of Eberhard Faber—i. e., the property at present standing in the name of Mrs. Jenny Faber is to be transferred temporarily to her son Lothar W. Faber, in order that he, jointly and severally with Mr. John Eberhard Faber, execute a new bond, which is to accompany the mortgage newly to be executed by Mr. Lothar W. Faber. As soon as this bond, which is to be given by both partners of the firm of Eberhard Faber, shall have been executed, the title in the property is to be retransferred to Mrs. Jenny Faber.

"Par. 3. This agreement, as laid down in paragraph 2, is to be performed within four months from the date of this instrument. For the same period of time, of four months, the firm of A. W. Faber agrees to desist from further proceeding in the suit brought against the firm of Eberhard Faber.

"Par. 4. As soon as Baroness Ottilie von Faber shall have come into the possession of the new properly executed mortgage deed, and into possession of the bond described in paragraph 2, she will withdraw completely the suit brought against the firm of Eberhard Faber, and the provisions inserted into the Contract of February 26th, 1894, regarding the repayment of $100,000, shall then be considered as canceled.

"Par. 5. The firm of Eberhard Faber binds itself to stamp all manufactures connected with lead pencils traceable to its establishment, not without first name, or at least with the initials of the first name, and under all circumstances to avoid anything which could tend to confusion as to the manufactures of the two firms.

"This agreement shall have full validity only after Mr. John Eberhard Faber, as copartner of the firm of Eberhard Faber, shall have added his signature here below.

"Stein and New York, March 16th, 1898. A. W. Faber.
"Lothar W. Faber.
"Eberhard Faber."

Under this agreement, the defendant should have labeled his pencils, etc., either "J. E. Faber," or with his full name, "J. Eberhard Faber," or "John E. Faber." This is evidently the letter and spirit of the agreement. The purpose was to sufficiently separate the designations, and there is a wide difference, on such a question as is presented in this case, between "J. E. Faber" and "E. Faber." March 16, 1898, the signs on defendant's factory at Greenpoint were "Faber's Pencil Co." The complainant protested, but defendant did not change the signs until about the time the bill of complaint herein was filed. As late as September, 1900, the defendant's pencils were being sold, even at Calcutta, Asia, marked, "Faber Pencil Co., U. S. A." In short, the defendant violated both the letter and spirit of the agreement. Owing largely, if not entirely, to these acts of the defendant, communications intended for the one house would go to the other, and vice versa. If either has the right to use the name "Faber" alone, in designating pencils and kindred goods, that right belongs to the complainant. The house of A. W. Faber was so old and so well established and so well known, and its goods were so popular and reliable, that, in the estimation of the public and of the trade, "Faber pencils," etc., and "Faber Pencil Co.," conveyed to them the idea of A. W. Faber's pencils, etc. The name "E. Faber" does not sufficiently distinguish the defendant's goods from the complainants' to prevent confusion with the public and the trade, and the result has been, is, and will be, as stated, that the trade and users of pencils, etc., purchase and use defendant's goods when intending to purchase and use the complainants'. This fact is well known to the defendant, and such result was and is intended by him, and is the natural result of his conduct and business methods.

There is a great mass of evidence in this case, to which the court has given careful attention. Some five days were given to the argument, and this court has given the briefs of counsel a careful reading and careful consideration, with the above result as to the salient facts.

The question is, what remedy, if any, can this court give the complainant? It seems plain that the defendant ought to be restrained and enjoined from using the name "E. Faber," alone, in making, advertising and designating his goods, so far as they compete with those of the complainants. The complainants use the name "A. W. Faber." The defendant should use the name "J. E. Faber," or "J. Eberhard Faber," or "Eberhard Faber," as he may elect. Both are carrying on the business of manufacturing lead pencils.

and the other goods mentioned. They are in competition. Such competition should be fair. Neither has the right to monopolize the name "Faber," or resort to unfair methods, resulting in confusion or injury to the business of the other, of the character mentioned. Many other transactions and occurrences might be mentioned, demonstrating the facts found as above stated, but it is unnecessary to enter into details.

It is not assumed that the defendant, as an original proposition, may not put his pencils in packages to suit himself, or use such colored wrappers and labels as he pleases, or number the grades as he sees fit; but when this is done by him in imitation of the goods of the house of A. W. Faber, for the purpose of injuring the business of that house, and supplanting their pencils, etc., by his own, and leading the purchasing and consuming public and the trade to think they are still purchasing and using the goods of A. W. Faber, a different question is presented. The father of the defendant, when acting as sole agent for the United States for his uncle, the complainant house, took out for himself, and registered as his own, the trade-mark "A. W. Faber," but subsequently assigned it to the Baron Lothar von Faber, then the house of which the complainant is the successor. Subsequently the defendant applied in his own behalf for the trade-mark "A. W. Faber." This is mentioned as bearing on the intent of defendant. Defendant admits he did not know of the taking out of such trade-mark and its assignment.

The defendant urges that the complainant has acquiesced in the acts of the defendant, especially in his use, etc., of the names "E. Faber," "Faber Pencil Company," etc., and that the complainant's laches should bar the granting of injunctive relief. The court does not agree with this contention. The complainant has been constantly objecting when these acts of defendant have become known to it. Negotiations have been had, changes made, etc., but defendant has failed to comply with just demands—even with the terms of his own written agreement. The complainant, at last, was compelled to resort to the courts. No undue haste was shown to precipitate a family litigation, and the court holds that there has been, under the circumstances, no laches. There are cases where resort to the courts should be speedy, and others where a resort to litigation should be the last remedy resorted to.

Actions to restrain unfair competition in trade, it is said, are based essentially upon fraud. That fraud must be proved. It cannot be inferred from unimportant similarities not calculated to mislead the purchaser. That the action may be maintained where it appears that the defendant is destroying or attempting to destroy an honest business by dishonest means. That the gravamen of the action is a fraudulent purpose on the part of the defendant to represent to the public that the plaintiff's business is his business, and by fraudulent misstatements to deprive the plaintiff of profits which he would otherwise receive. Per Cox, J., Second Circuit, October term, 1902 (Kipling v. G. P. Putnam's Sons, 120 Fed. 631). The court cites Lawrence Manufacturing Company v. Tennessee Manufacturing Company, 138 U. S. 537–549, 11 Sup. Ct. 396, 34 L. Ed. 997.

In Globe-Wernicke Co. v. Brown & Besly, 121 Fed. 90, the court (C. C. A., Seventh Circuit) held, "The imitation of complainant's box letter files, by defendant, by the use of the same names, emblems, and colors, in such manner as to deceive purchasers as to their origin (that is, their true maker," constitutes unfair competition, which entitled the complainant to an injunction. Headnote 1 is as follows:

"Complainant for many years made and sold box letter files under the names of 'Leader' and 'Eureka' files. The names were printed on the back of each file, and also on an emblem on the first of the index sheets inside. Complainant's name did not appear on the files, but they became thoroughly well known to the trade by the names, make-up, and markings as the product of its factory, and attained a large sale. Subsequently defendant placed on the market files which copied those of complainant in names, emblems, colors, size, and style of type and general make-up, so exactly that it would mislead the ordinary consumer, and have nothing thereon to indicate the maker. Held, that such action constituted unfair competition, and entitled complainant to an injunction restraining defendant from the use of such imitations, including the names and emblems, without regard to whether or not they constituted trade-marks."

See, also, Hires Co. v. Consumers' Co., 41 C. C. A. 71, 100 Fed. 809; Sterling Remedy Co. v. Spermine Medical Co., 50 C. C. A. 657, 112 Fed. 1000.

In Globe-Wernicke Co. v. Brown et al. (C. C.) 121 Fed. 185, held, that the word, "elastic," under the evidence, had been used by the plaintiff for such a length of time as to have acquired a secondary meaning in the trade and with the general public, as identifying its sectional bookcases, and similar articles of its manufacture, and to entitle it to protection against the use of such word in connection with the goods of other manufacturers, even if not valid as a technical trade-mark.

In Bissell Chilled Plow Works v. T. M. Bissell Plow Co. (C. C. A., D. Mich.) 121 Fed. 357, held, that "the right to relief in an action for unfair competition in trade is not dependent upon an actual fraudulent intent, where the conduct of defendant was such as would naturally deceive the public as to the origin of the goods, and where it is shown that such deception actually resulted." A person is ordinarily held to intend the consequences of his acts, when he understands his acts, and they are deliberate, especially; and, if such acts by a business competitor are calculated to deceive the trade, the public, and the user, and to palm off the goods or manufactures of such person for those of his competitor, and such is the actual result, and such person refuses to cease such conduct, the legitimate conclusion is that he intended and intends to cheat and defraud not only the competitor, but the trade, the general public, and the users and consumers. Such acts, persisted in, constitute fraud.

In the case last cited (121 Fed. 357) the first headnote is as follows:

"Complainant corporation was organized in 1881 under the name of 'The South Bend Pulp Company,' and engaged in business at South Bend, Ind., in the manufacture of wood pulp, and also in the manufacture and sale of plows. Its largest stockholder, who was president and general manager, was T. M. Bissell, who had been in the manufacture of plows for some years, and was the holder of patents for improved methods of making the same, which he transferred to the corporation. Its plow business was separate, and

was always conducted under the department name of 'The Bissell Chilled Plow Works,' and all of its plows were marked with the name 'Bissell,' in connection with other designations, and became known to the trade by such name. The making of plows was or became its principal business, and in 1891, with the consent of Bissell, its name was changed, through statutory proceedings in the court, to 'The Bissell Chilled Plow Works,' and it continued its business from that time under such name. About that time, Bissell, having sold a part of his stock, retired from the management, and he thereafter organized a corporation under the name of 'The T. M. Bissell Plow Company,' which engaged in the manufacture and sale of plows in South Bend, making substantially the same plows as complainant, and marking them with the name 'Bissell.' After a year or so Bissell died, and the business of such corporation was discontinued. Subsequently certain of defendants residing at Eaton Rapids, Mich., purchased a part of the stock, patterns, etc., of the corporation, taking an assignment of the right to use its corporate name, and organized the defendant corporation under the same name which engaged in making plows at Eaton Rapids. Circulars were issued, stating the removal of the company from South Bend, and containing pictures of Bissell, and referring to him as 'the inventor of chilled plows, once made in South Bend, Indiana, now only by the T. M. Bissell Plow Co., Eaton Rapids, Mich.' Its plows were also all marked with the name 'T. M. Bissell,' and were similar in design and appearance to those of complainant. The original Bissell patent for chilling was owned, and the process used, by complainant, which also held shop rights for the use of later patents, some of which were afterward owned and used by defendant. No one by the name of Bissell, or connected with the prior Indiana corporation of the same name, had any connection with defendant. There was evidence that retail purchasers in many cases did not know the difference between the two makes, and would accept either as a Bissell plow. Held, that the second Indiana corporation had no right to use the name 'Bissell' as it did, either in its corporate name or as a mark on its product, as against complainant, which had acquired the prior right, and that defendant obtained no right by the attempted assignment; that the action of defendant in the use made of the name in both respects constituted unfair competition."

In Walter Baker & Co. v. Sanders, 80 Fed. 889, 26 C. C. A. 220, held:

"One entering into competition with another person of the same name, who has an old, established business, is bound to distinguish his goods from those of the latter so as to prevent confusion." Also: "When, by long use, the words 'Baker's Chocolate' had come to mean, in the minds of the public, complainant's goods, held, that a subsequent maker of chocolate, with the same name, was not entitled to use that name, whether with his given name or its initials, in such manner as to announce that the goods he sells are 'Baker's Chocolate.' "

This rule seems to be just and equitable. While ordinarily every man has the right to use his own name as he pleases, still he has no right to use it in such a way as to deceive the public or the trading or business world, or in such a manner as to purposely injure the business of his competitor of the same name by disposing of his own wares as the manufactures of this business rival. Especially is this true when such business competitor has the older business, and the first long-established use of the name.

In Elgin National Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365, the Supreme Court held:

"Words which are merely descriptive of the place where an article is manufactured cannot be monopolized as a trade-mark, and this is true of the word 'Elgin,' as in controversy in this case. Where such word has acquired a secondary signification in connection with its use, protection from

imposition and fraud will be afforded by the courts, while at the same time it may not be susceptible of registration as a trade-mark under the act of Congress of March 3, 1881 [21 Stat. 502, c. 138, U. S. Comp. St. 1901, p. 3401]."

In the opinion the court said:

"In other words, the manufacturer of particular goods is entitled to the reputation they have acquired, and the public is entitled to the means of distinguishing between those and other goods: and protection is accorded against unfair dealing, whether there be a technical trade-mark or not. The essence of the wrong consists of the sale of the goods of one manufacturer or vendor for those of another. * * * But where an alleged trade-mark is not in itself a good trade-mark, yet the use of the word has come to denote the particular manufacturer or vendor, the relief against unfair competition or perfidious dealing will be awarded by requiring the use of the word by another to be confined to its primary sense, by such limitations as will prevent misapprehension on the question of origin. In the latter class of cases such circumstances must be made out as will show wrongful intent in fact, or justify that inference from the inevitable consequences of the act complained of."

Citing Lawrence M. Co. v. Tennessee M. Co., 138 U. S. 537, 549, 11 Sup. Ct. 396, 34 L. Ed. 997; Coats v. Merrick Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118.

This being true of a mere geographical name—the name of a place where the business is carried on or the goods are made—how much more ought the same principle to apply in the case of the name of the manufacturer or vendor of an article!

It, of course, stands to reason, and is in accord with common sense, that no man can be compelled to forego the use of his own name in carrying on his business. That is not what the courts have done or attempted to do. This is not attempted in this case. But the courts have and will, in a proper case, direct two persons of the same name, or doing business in the same place, to so use their names, or the name of the place, as to prevent the one from intentionally injuring the legitimate and established business of the other, or deceiving the public as to the origin of the goods they are purchasing or using. If the defendant is willing to rely on the merits and reputation of his own goods, he should be willing to label, mark, and advertise them as the goods or manufactures of "J. Eberhard Faber," or "John E. Faber," or "Eberhard Faber" (the name of his house); and there is no necessity, if honest competition is the intention, for using the mere initial "E." in connection with the word "Faber." It must always be remembered in this connection that the house of "A. W. Faber" established the lead pencil business not only in Europe, but in the United States, and that Eberhard Faber, the father of the defendant, and brother of Baron von Faber (plaintiff's predecessor), was merely the agent of the house of A. W. Faber, and that until 1895 or 1896 the defendant was merely agent, having the right to make and sell some inferior grade of domestic pencils on his own account. The defendant has no right to the name "Faber," but, as he succeeded his father, it is not improper to allow him the use of the name "Eberhard Faber," although that is not his full name. That is the name of defendant's house, as "A. W. Faber" is the name of complainants' house.

In this connection it may be well to call attention to Allen B. Wrisley Co. v. Iowa Soap Co. (C. C. A.) 122 Fed. 796, and the cases there cited, although the case declares no new principle. In Royal Baking Powder Co. v. Royal (C. C. A. 6th Circuit, March 16, 1903) 122 Fed. 337, we have another decision relating directly to confusion, etc., unfair competition, growing out of the use of the same name, and the power and duty of the court in such cases.

It has been intimated and suggested that the confusion has resulted largely from the acts and conduct of the complainant, or complainant house. If this were true, or such confusion was contributed to by complainant, the court would deny relief. Worden v. California Fig Syrup Co., 187 U. S. 516, 23 Sup. Ct. 161, 47 L. Ed. 282. That is a trade-mark case, but the same principle should apply here. But this court cannot find evidence that the complainant house is at all responsible for the existing conditions, unless it be said that, desiring to avert family litigation, it allowed the defendant too much time, "too much rope," during which he grew bolder and more aggressive, instead of desisting from conduct calculated to confuse and mislead the public, etc.

In R. W. Rogers Co. et al. v. William Rogers Manufacturing Co., 70 Fed. 1017, 17 C. C. A. 576, the headnote is:

"A corporation which, by arrangement with one R. W. R., takes his name, and stamps it upon articles sold by it, with the purpose of inducing the public to think that in purchasing such articles they are purchasing the product of another 'R' Company of established reputation, will be restrained from using such stamp."

In the opinion of Shipman, C. J., he says:

"There cannot be much controversy in regard to the aspect with which the law regards the state of facts disclosed in the affidavits. The fair and honest use of a person's own name in his ordinary and legitimate business, although to the detriment of another, will not be interfered with. A tricky, dishonest, and fraudulent use of a man's own name for the purpose of deceiving the public, and of decoying it to a purchase of goods under a mistake or misapprehension of facts, will be prevented. Every case under this branch of the law of trade-marks turns upon the question of false representation or fraud. In this case Rogers helped to establish a corporation which took his name for the purpose of inducing the public to think that they were buying the well-known Rogers goods, and for the purpose of surreptitiously obtaining the advantage of the good reputation which other manufacturers had given to articles stamped with that name. The use by the defendant corporation of this name is not merely an injury to the complainant, but it is an intentional fraud upon the public. The difference in the result with which a court of equity follows an honest and a dishonest use of one's own name, although each use injured the person who had honestly acquired a use of the name as a trade-name, is shown in the valuable cases of William Rogers Mfg. Co. v. Rogers & Spurr Mfg. Co. [C. C.] 11 Fed. 498, and Same v. Simpson, 54 Conn. 527 [9 Atl. 395], where, as well as in Rogers v. Rogers, 53 Conn. 121, 1 Atl. 807, 5 Atl. 675 [55 Am. Rep. 78], a large number of reported cases upon this portion of the law of trade-marks are collected."

There is nothing in Rogers v. William Rogers Mfg. Co., 70 Fed. 1019, 17 C. C. A. 576, to conflict with the three cases cited.

In Wyckoff et al. v. Howe Scale Co. (C. C.) 110 Fed. 520, it was held:

"Plaintiffs acquired from the original manufacturers of Remington typewriters the sole right to use the name 'Remington' as a name for typewriters.

Thereafter descendants of the original manufacturers, also named 'Remington,' became members of a corporation making a typewriter under the name of 'Sholes,' when the name was changed to the 'Remington-Sholes.' Held that, since ultimate purchasers of typewriters might be led to think that the addition of the name 'Sholes' was a new style of the old machine, coming from the same source, such use of the name 'Remington' was an attempt to deceive the public and unwarranted. No special right to use a family name which has become a trade-mark applied to a manufactured article accrues by virtue of the relation which descendants bear to the original manufacturer of the same name, such descendants being entitled to no other than their natural rights to use their own names in the transaction of their own business."

This would seem to dispose of the claim of the defendant that he has inherited the right in any manner to use the name "Faber" as he pleases, when such use interferes with the right of the complainant.

In Enoch Morgan's Sons Co. v. Whittier-Coburn Co. (C. C.) 118 Fed. 657, held:

"It is within the discretion of the court to enjoin an imitation of another's goods in the matter of form, color, or lettering of packages, when it is proven directly, or by strong inferential evidence, that the imitation was willfully made, or when such imitation, though innocently made, results in damage to the one whose rights are infringed. A manufacturer who so dresses his goods as to enable retail dealers to sell them to customers as those of a competitor earlier in the market is chargeable with unfair competition, although he is careful himself to sell them as his own."

In Walter Baker Co. v. Baker (C. C.) 77 Fed. 181, it is held:

"A man has a right to use his own name in connection with any business he honestly desires to carry on, but he will not be allowed to use it in such a way as to injure another having the same name; and, to prevent such injury, equity will direct him how he shall use his name to denote his own individuality. The court cannot give great weight to mere denials by defendant of any intent to infringe, but will deduce his intent from his acts. One who enters into competition with another person of the same name, who has an old and established business, is under an obligation to more widely differentiate his goods from those of the latter than is required of third persons having different names."

Meyer v. Medicine Co., 58 Fed. 884, 7 C. C. A. 558, and Landreth v. Landreth (C. C.) 22 Fed. 41, and Pillsbury v. Flour Mills, 64 Fed. 841, 12 C. C. A. 432, are instructive cases on the subject of the use of the same name by competitors in trade and in manufacture.

It does not seem necessary to cite further authority in this case. In this country the law preventing unfair competition in trade has been of slow growth, but the doctrine stated in the most recent of the preceding cases appears to be firmly established. This court agrees with the principles there laid down. The complainant in this case is not a resident of this country, while the defendant is. This makes no difference, however. The complainant has the right to carry on business here, and, while conforming to our laws, is entitled to their protection.

The complainant is entitled to a decree enjoining and restraining the defendant from using the name "Faber" alone as applied to pencils or rubber stationer's goods, and from using the name "Faber Pencil Company," or "E. Faber Pencil Company," and from making, selling, or causing to be made or sold, or advertising, or caus-

ing to be advertised, any lead pencils, erasive rubber, or rubber bands, bearing thereon, or on the labels, wrappers, boxes, or other coverings affixed thereto, or in which the same are contained, either stamp lettering or other marks containing the name "Faber," or "Faber Pencil Co.," or "E. Faber Pencil Co.," or any like or similar designation in which the name "Faber" is used without the prefix "Eberhard," or "John E.," or "J. Eberhard," but the defendant may use the word "Faber" with either of said prefixes, as he may elect.

This court at this time, and under the evidence, is of the opinion that injunctive relief to this extent is all that the complainant is entitled to, and all that is necessary. This court is of the opinion that it would not be justified in enjoining or restraining the defendant from using such colored wrappers as he may ·elect or see fit to use, or from putting up his pencils in such form of packages as he desires to use. See Globe-Wernicke Co. v. Fred Macey Co. (C. C. A.) 119 Fed. 696.

The defendant has no right, in advertisements, to represent himself as the successor to the house of A. W. Faber, or as in any way representing it. He never had any connection with it, except as sole agent. The complainant is entitled to an accounting and to a judgment for such damages as it may show. The court will make some provision as to goods now on hand bearing the name "E. Faber."

The decree may be settled before me on October 6, 1903, at Auburn, N. Y., or at such prior time and other place as may be agreed upon by the parties.

Decreed accordingly.