### GORHAM MFG. CO. v. WEINTRAUB et al.

(District Court, S. D. New York. May 9, 1912.)

1. **TRADE-MARKS AND TRADE-NAMES** (§§ 21, 97*)—**MARKS SUBJECT OF OWNERSHIP**—**USE IN FOREIGN COUNTRY.**

A manufacturer of silver ware in the United States is not precluded from adopting as a trade-mark a combination of emblems, consisting of a lion passant, an anchor, and the letter G in old English, by the fact that each was previously used as an English hall-mark, and that used

in combination they constitute the hall-mark of the Birmingham Assay Office, where such hall-marked ware was not shown to have been imported into this country to any considerable extent previous to such adoption, and its use of such trade-mark for 50 years during which it has become well known as indicating ware of its manufacture entitles it to protection by injunction against infringement by another American manufacturer.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 24, 110, 111; Dec. Dig. §§ 21, 97.*]

**2. COMMON LAW (§ 7*)—ENGLISH STATUTES—HALL-MARKS.**

The English statute of 1773 relating to hall-marks is not in force in the United States.

[Ed. Note.—For other cases, see Common Law, Cent. Dig. § 7; Dec. Dig. § 7.*]

**3. TRADE-MARKS AND TRADE-NAMES (§ 45*)—COMMON-LAW TRADE-MARKS.**

A manufacturer is not deprived of his right to a common-law trademark by the registering of other additional trade-marks.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 53; Dec. Dig. § 45.*]

**4. TRADE-MARKS AND TRADE-NAMES (§§ 70, 97*)—UNFAIR COMPETITION—INJUNCTION.**

Manufacturers of silver-plated ware, who made and sold articles resembling in design and general appearance solid or sterling silver ware made by complainants and at the request of customers who were dealers stamped thereon imitations of the trade-marks or other identifying marks by which complainant's ware was known to purchasers, for the purpose and with the effect of creating confusion, are chargeable with unfair competition which entitles complainant to an injunction.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 81, 110, 111; Dec. Dig. §§ 70, 97.*

Unfair competition in use of trade-mark or trade-name, see notes to Scheuer v. Mueller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

In Equity. Suit by the Gorham Manufacturing Company against Frederick Weintraub and Morris Weintraub. On final hearing. Decree for complainant.

See, also, 180 Fed. 639.

Hugo Mock, Harry C. Adams (Frederick P. Fish, E. T. Fenwick, and L. L. Morrill, of counsel), for complainant.

Benno Loewy, for defendants.

James Gillin, amicus curiæ for the British Government.

HAZEL, District Judge. [1] The bill of complaint charges the infringement of complainant's trade-mark, consisting of the figure of a lion, the representation of an anchor, and the capital letter G in old English, by the defendants, who are copartners and citizens of the state of New York. The bill alleges that beginning in 1831 the predecessors of the complainant—successive partnerships—conducted the manufacture of solid or sterling silver ware in Providence, R. I.; and that subsequently the business was conducted by the Gorham Company, a copartnership which in 1863 was succeeded by the Gorham Manufacturing Company, the complainant, a citizen of the state of Rhode Island. It is alleged that continuously and without inter-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ruption, for a period of 56 years, the solid or sterling silver ware of the complainant and its predecessors was conspicuously marked or stamped with said trade-mark to designate the particular kind of silver ware manufactured by it; that such trade-mark was at all times displayed upon its silver ware, circulars, advertisements, trade publications, and other printed matter, as a result of which the Gorham Manufacturing Company became favorably and extensively known throughout this country as a manufacturer of silver ware of the highest quality; and that the complainant's predecessors were the first in the United States to use said trade-mark upon silver ware. The said allegations of the bill are fairly sustained by the proofs.

The following is a sketch of the trade-mark in controversy:

The bill also alleges unfair competition by the defendants in the use upon their products, an electroplated or silver-plated ware, of the following representation:

The use of such mark by the defendants in connection with the sale of their products is not denied. The principal defenses are: (1) That the three symbols—the lion passant, the anchor, and the old English letter G—in juxtaposition, form an English hall-mark, and therefore cannot be adopted in this country as a valid trade-mark; (2) that complainant's marks are not used to indicate the origin or ownership of the articles to which they are affixed, but for the purpose of identifying the class or quality; (3) that a trade-mark consisting of a combination of the figures and letter G in suit is a violation of the treaties between Great Britain and the United States; and (4) noninfringement.

The defenses in their entirety are not only novel, but extremely interesting, and are asserted by counsel for the defendants with vigorous elaboration. But, in the view taken of this case, the principal question arising on the merits is whether the complainant has the legal right to enforce its asserted common-law trade-mark claimed to have been exclusively applied by it first to articles of standard coin silver, and, since 1868, to those of sterling quality. Had the complainant the right, for the purpose of designating silver ware of a certain grade, to adopt and use the three symbols—the lion passant, the anchor, and the capital letter G—which were the fac simile of a prior British hall-mark of the Birmingham Assay Office? Before dwelling upon the evidence contained in a voluminous record, the general rule may be stated that any one has the unquestionable right to make his merchantable commodities known to the purchasing public by attaching thereto a name, mark, or device not previously used by another on commodities of the same general kind or description. Such device must be for the purpose of enabling the user to impart to his salable article, to which it is affixed, an unmistakable charac-

teristic to the end that there may be positive identification and differentiation from articles of a similar character produced by another. But if the mark or device originated and used by one is afterwards adopted and used on similar articles by another to create the impression that such articles were manufactured or sold by the former, then obviously a fraud or deception is practiced upon the public by the latter such as a court of equity will restrain. Manhattan Medicine Co. v. Wood, 108 U. S. 218, 2 Sup. Ct. 436, 27 L. Ed. 706; Browne on Trade-Marks, pp. 101–162.

The claim of the defendants that the trade-mark was really adopted to identify the class or quality of the silver ware, and not its ownership or origin, is not substantiated by the evidence. Therefore I conceive that the crucial questions arising from the alleged infringement of the trade-mark are: (1) Whether its adaptation as early as 1859, as appears by the proofs, and continuous use in this country by the complainant down to the present time, were in fact an appropriation of a British hall-mark or the essential parts thereof, and therefore not subject to a valid trade-mark; and (2) whether such hall-mark at the time of its simulation by complainant had achieved a reputation in this country such as would mislead the public when buying complainant's silver ware into believing it was buying hall-marked ware.

A temporary injunction was granted herein by Judge Lacombe (176 Fed. 927) restraining the defendants from using the trade-mark in controversy. The application was heard and considered upon a record which was not materially different from that which is now before this court, save perhaps for the interposition of the British government, the arguments submitted by it, and the refusal by the Patent Office to register complainant's trade-mark—matters to which reference will later be made in this opinion. In granting the injunction, Judge Lacombe in broad terms expressed the opinion that a manufacturer or dealer in silver ware in the United States is not precluded from adopting as a trade-mark an impression made up of three marks or symbols by the fact that placed side by side they would indicate to a buyer of English silver ware that the article so marked was sterling ware made in the city of Birmingham in 1831. The learned court said that when the dealer "has used the particular combination on his ware made in this country, for upwards of 40 years, and the same has been accepted by the trade as his identifying mark, without imitation by any one, he is entitled to an injunction at least until final hearing."

In Kaiserbrauerei, Beck & Co. v. J. & P. Baltz Brewing Co. (C. C.) 71 Fed. 695, Judge Dallas decided that a mark of identity affixed to a vendible article, which could not be lawfully appropriated for such purpose in a foreign country, could nevertheless be properly appropriated and used as a valid trade-mark in the United States. The Circuit Court of Appeals for the Third Circuit, affirming such decision (74 Fed. 222, 20 C. C. A. 402), held that the provision in the treaty with Germany that its citizens living in the United States shall receive the same protection as native citizens in matters of trade-

mark, etc., cannot be construed to preclude an alien German from acquiring by prior use in this country a trade-mark in a particular word, though such use would not be allowed in Germany. The principle laid down in the cases cited is applicable to the case at bar.

The evidence conclusively establishes that from the time the mark was first used it was the intention of the complainant's predecessors to make their silver ware of coin and sterling standards favorably known to the public by their trade-mark—the lion, the anchor, and the letter G—and that in this intention they have been successful. That the lion passant, when used as a trade-mark in England or elsewhere, is expressive of superior workmanship or superior quality, and that the anchor is known in England to represent the place of manufacture, and that the hall-mark is protected in England by statute—are not enough to deprive the complainant of the right to use such features, in combination with the old English letter G, as its trade-mark in this country. Sight should not be lost of the fact that such adoption occurred many years since at a time when it may fairly be presumed the Birmingham hall-mark was little known in the United States. It has several times been held by the federal courts that a trade-mark used abroad may be adopted by one in this country in connection with a similar article provided its adoption was in good faith. Richter v. Anchor Remedy Co. (C. C.) 52 Fed. 455. And though British hall-marks are not strictly trade-marks, this rule is thought analogous.

The Circuit Court of Appeals, affirming Richter v. Anchor Remedy Co., 59 Fed. 577, 8 C. C. A. 220, held that sale to a limited extent in this country by a foreign manufacturer did not amount to such use or publicity as would indicate an intention to adopt as a trade-mark the marks upon the articles sold. Thus it would appear that any limited number of sales in this country, before or since complainant's adaptation, of hall-marked silver ware assayed in Birmingham, did not absolutely deprive it of the right to use a similar emblem upon its vendible wares. Hence the principal questions are whether the complainant originated the trade-mark in this country, the place where the articles are manufactured and sold, and whether, after the exclusive use thereof by the complainant for a period of time sufficiently long to give the goods so marked a reputation for fineness or quality, the defendants by their imitation infringed the same.

It is not clearly shown that silver ware hall-marked at Birmingham had been imported into this country, or that such hall-mark was distinctively known at the time complainant first stamped the three emblems upon its goods. Indeed, the proofs are that such combined emblems are understood in this country as a badge affirming that the wares are the handiwork of the Gorham Manufacturing Company. The evidence does not disclose the importation into this country of a sufficiently large quantity of silver ware bearing the insignia of the Birmingham Assay Office to affect the complainant in the prior right to the use of its trade-mark as against another citizen of this country who wrongfully simulates the same and affixes it to an inferior grade of silver ware. While it is true that the said hall-mark

is stamped upon silver ware produced in Birmingham in large quantities and sold in Great Britain, yet that fact standing alone is insufficient to preclude the complainant from using the mark adopted by it half a century ago, even though the adaptation bears a strong resemblance to the Birmingham hall-mark despite the omission of the date letter and duty mark which, according to the publications of Buck, Jackson, Cripps, and Chaffers, accompanied in the authorized Birmingham hall-mark, the three emblems previously mentioned. There was introduced in evidence a silver spur, which, according to the testimony of the witness Westwood, was legally hall-marked in the year 1830 or 1831, such mark consisting of the said features, without, however, having the maker's mark and duty mark alined with the principal emblems.

Further discussion of the right of the complainant to simulate the Birmingham hall-mark for identifying its products makes it desirable that I should here state that the British government by consul amicus curiæ has submitted an able brief in opposition to the claims of the complainant, in which it is requested that it be determined by the judgment of this court that neither of the parties to this litigation can lawfully acquire trade-mark rights in the emblems of the lion passant, the anchor, and the letter G, on the ground that such insignia is the hall-mark of the Birmingham Assay Office. The importance of this question thus presented is not underestimated, and, indeed, so impressed by it was the Commissioner of Patents that he reconsidered the application by complainant for registration of the trade-mark and held it to be a simulation of the insignia of the British government which public policy required should be refused registration. The decision of the Commissioner of Patents is entitled to the careful thought which I have given it, but I am not persuaded by his reasoning that the trade-mark in controversy is invalid. This action is not based on any registration rights under the federal statute, but is brought by virtue of common-law rights—rights obtained because of the uninterrupted use of the mark for many years by the complainant in connection with its business, and because of rights prescriptive in their nature and superior to those of other citizens of this country in the said trade-mark, or, indeed, as the record stands, superior even to the rights previously obtained by another under the laws of England. The English statute relating to hall-marks cannot be given extraterritorial effect to bar a trade-mark adopted in this country and known to the trade as designating particular products of the complainant. McLoughlin v. Raphael Tuck Co., 191 U. S. 267, 24 Sup. Ct. 105, 48 L. Ed. 178; Baglin v. Cusenier Co., 221 U. S. 580, 31 Sup. Ct. 669, 55 L. Ed. 863; Kaiserbrauerei, Beck & Co. v. J. & P. Baltz Brewing Co., supra. And in applying the rule of nonextraterritorial effect I may with propriety quote the words of Mr. Justice Hughes in the recently decided case of Ferris v. Frohman, 223 U. S. 424, 32 Sup. Ct. 263, 56 L. Ed. ——, that:

There is no "indication of a purpose to incapacitate British citizens from holding their intellectual products secure from interference in other jurisdictions in accordance with the principles of common law."

If this were an action by a British subject to enjoin infringement of the Birmingham hall-mark complaining that his property rights had been invaded, and it was shown that hall-marked silver ware had previously been imported into the United States, a different question would be presented for decision. And even in that case something more would be required to establish such right than an importation "to a limited extent upon special orders, to supply particular customers." Richter v. Anchor Remedy Co., supra; Kohler Mfg. Co. v. Beshore (C. C.) 53 Fed. 262; MacMahan Pharmacal Co. v. Denver Chemical Mfg. Co., 113 Fed. 468, 51 C. C. A. 302; Tetlow v. Tappan (C. C.) 85 Fed. 774. But in a litigation between citizens of this country it is to me perfectly plain that one cannot be permitted to infringe upon the prior rights of the other in a trade-mark by the use of which the latter has built up an extensive trade in a particular commodity. True enough, there is evidence showing importations of silver ware from Birmingham since the year 1850; but whether they bore the Birmingham hall-mark or some other hall-mark does not appear. There have been some importations since 1878 bearing the Birmingham hall-mark, but according to the proofs they were few prior to 1891, and it nowhere positively appears that silver ware containing the Birmingham hall-mark was imported into the United States anterior to complainant's adoption of such marking. It is unnecessary to go with more detail into the evidence relating to importations.

[2] The defendants have urged that to hold the trade-mark valid would be a violation of the treaty between the United States and Great Britain, and, furthermore, that such a monopoly would interfere with importations of silver ware from England and its possessions; but this contention, in view of what has been said, is without merit. It is further argued, and the point presented for consideration, that the act of Parliament of 1773, relating to hall-marks, was a public act which became operative throughout the colonies, and was continued in force by the first Constitution of the state of New York. It is true enough that the first Constitution of this state provided that such parts of the common law of England, and of the statute law of Great Britain, and of the acts of the Legislature of the colony of New York, as formed the law of the colony in the year 1775, should constitute the law of this state, etc. But in answer to this contention it is enough to say that such provision, save as to the common law, was not included in subsequent Constitutions, and therefore is not now the fundamental law of this state; nor are the English statutes, under which silver ware manufactured in England is hall-marked, in force in the United States.

It next appears that the claim of complainant to an exclusive right in the trade-mark in suit was not sustained in an action brought in the Exchequer Court of Canada against Ellis & Co., and it is insisted by defendants that the principle upon which that case was decided applies here. It was not, however, determined in that case that the use of complainant's trade-mark in Canada was unlawful, nor was it held that the statutes of England as to hall-marking, standing alone,

were sufficient to preclude complainant from enforcing its trade-mark rights in Canada. The adverse decision was based upon the fact that the Birmingham hall-mark had been in use in Canada for a continuous period prior to complainant's use. As to whether the evidence relating to such prior use in Canada was as meager and unsatisfactory as in this case does not appear, but it may be presumed, I think, to the contrary, as the learned court regarded the evidence sufficient to establish the claim of anticipation.

[3] The next inquiry is as to the effect of marks registered by the complainant, or for which applications for registration were filed. It appears that the essential features of one registered trade-mark (No. 33,902, affixed to the bill) are three raised panels, but the specification, however, makes clear that each panel has on it a representation: The panel on the left, a lion; the central panel, an anchor; and the right panel, the letter G in old English—but that both the lion and anchor may be omitted. But in view of complainant's reliance on its common-law trade-mark, it is difficult to see how such marks or panels have any relevancy. It is unimportant that complainant has registered other trade-marks which it applies to articles differing in kind or quality. Such additional registered trade-marks were not an abandonment of complainant's common-law trade-mark, and their registration has not deprived it of right to protection in the use thereof. Layton Pure Food Co. v. Church & Dwight Co.; 182 Fed. 24, 104 C. C. A. 464; Saxlehner v. Eisner & Mendelson, 179 U. S. 19, 21 Sup. Ct. 7, 45 L. Ed. 60; Loonen v. Deitsch (C. C.) 189 Fed. 487.

[4] Concededly the defendants put upon their silver-plated ware a simulation of complainant's trade-mark—the anchor, the lion passant, and old English letter G—and, although proof of confusion is unnecessary (Gannert v. Rupert, 127 Fed. 962, 62 C. C. A. 594), consideration is nevertheless given the defense of noninfringement in treating of defendants' liability for unfair dealing in trade. It is proven that the defendants, with the intention of diverting to themselves a portion of the good will of complainant's business, have put upon the market and sold a silver-plated ware of inferior grade, but of the same general appearance, as that of the complainant's solid or sterling ware, and to accomplish their purpose have used the complainant's insignia or trade-mark to cause it to be believed that their goods were of the same quality as complainant's. When the defendants put their inferior grade of silver ware, which has the appearance of complainant's, on the market, and then brand and stamp it with the anchor, lion, and letter G, a customer acquainted with complainant's stamp or mark is likely to fall into error and to mistake the defendants' ware for complainant's. Pillsbury-Washburn Flour Mills Co. v. Eagle, 86 Fed. 608, 30 C. C. A. 386, 41 L. R. A. 162. That the defendants intended to engage in competition with complainant and by unfair and dishonest means to divert to themselves a part of its business is undeniable; actual confusion from the similarity of marking sufficiently appearing by the testimony of witnesses Atkins and Falding. The affidavit of Frederick Weintraub shows that the firm used on its silver-plated ware various marks which had been given

it by different dealers for whom the ware was manufactured. From such testimony and acts it appears that there was an intention on the part of the defendants to misrepresent their goods, and they must be held to have intended the consequences of their acts. Von Faber et al. v. Faber (C. C.) 124 Fed. 603; Devlin v. McLeod (C. C.) 135 Fed. 164; Florence Mfg. Co. v. J. C. Dowd & Co., 178 Fed. 73, 101 C. C. A. 565. It is not enough that the defendants sold their ware as silver-plated ware and that dealers were cognizant of the character thereof. Pillsbury-Washburn Flour Mills Co. v. Eagle, supra.

Other questions have been argued; but, in view of the foregoing, they need not be substantially passed upon. The complainant is entitled to a decree as prayed for in the bill, with costs.